(Slip Opinion) OCTOBER TERM, 2018 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AMERICAN LEGION ET AL. *v.* AMERICAN HUMANIST ASSN. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 17–1717. Argued February 27, 2019—Decided June 20, 2019[*]

In 1918, residents of Prince George's County, Maryland, formed a committee for the purpose of erecting a memorial for the county's soldiers who fell in World War I. The committee decided that the memorial should be a cross, which was not surprising since the plain Latin cross had become a central symbol of the war. The image of row after row of plain white crosses marking the overseas graves of soldiers was emblazoned on the minds of Americans at home. The memorial would stand at the terminus of another World War I memorial—the National Defense Highway connecting Washington to Annapolis. When the committee ran out of funds, the local American Legion took over the project, completing the memorial in 1925. The 32-foot tall Latin cross displays the American Legion's emblem at its center and sits on a large pedestal bearing, *inter alia*, a bronze plaque that lists the names of the 49 county soldiers who had fallen in the war. At the dedication ceremony, a Catholic priest offered an invocation and a Baptist pastor offered a benediction. The Bladensburg Cross (Cross) has since been the site of patriotic events honoring veterans on, *e.g.,* Veterans Day, Memorial Day, and Independence Day. Monuments honoring the veterans of other conflicts have been added in a park near the Cross. As the area around the Cross developed, the monument came to be at the center of a busy intersection. In 1961, the Maryland-National Capital Park and Planning Commission (Commission) acquired the Cross and the land where it sits, but

———————

[*]Together with No. 18–18, *Maryland-National Capital Park and Planning Commission* v. *American Humanist Assn. et al.*, also on certiorari to the same court.

the American Legion reserved the right to continue using the site for ceremonies. The Commission has used public funds to maintain the monument ever since.

In 2014, the American Humanist Association (AHA) and others filed suit in District Court, alleging that the Cross's presence on public land and the Commission's maintenance of the memorial violate the First Amendment's Establishment Clause. The American Legion intervened to defend the Cross. The District Court granted summary judgment for the Commission and the American Legion, concluding that the Cross satisfies both the test announced in *Lemon* v. *Kurtzman,* 403 U. S. 602, and the analysis applied by JUSTICE BREYER in upholding a Ten Commandments monument in *Van Orden* v. *Perry*, 545 U. S. 677. The Fourth Circuit reversed.

*Held*: The judgment is reversed and remanded.

874 F. 3d 195, reversed and remanded.

JUSTICE ALITO delivered the opinion of the Court with respect to Parts I, II–B, II–C, III, and IV, concluding that the Bladensburg Cross does not violate the Establishment Clause. Pp. 16–24, 28–31.

(a) At least four considerations show that retaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones. *First*, these cases often concern monuments, symbols, or practices that were first established long ago, and thus, identifying their original purpose or purposes may be especially difficult. See *Salazar* v. *Buono*, 559 U. S. 700. *Second*, as time goes by, the purposes associated with an established monument, symbol, or practice often multiply, as in the Ten Commandments monuments addressed in *Van Orden* and *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844. Even if the monument's original purpose was infused with religion, the passage of time may obscure that sentiment and the monument may be retained for the sake of its historical significance or its place in a common cultural heritage. *Third,* the message of a monument, symbol, or practice may evolve, *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 477, as is the case with a city name like Bethlehem, Pennsylvania; Arizona's motto *"Ditat Deus"* ("God enriches"), adopted in 1864; or Maryland's flag, which has included two crosses since 1904. Familiarity itself can become a reason for preservation. *Fourth*, when time's passage imbues a religiously expressive monument, symbol, or practice with this kind of familiarity and historical significance, removing it may no longer appear neutral, especially to the local community. The passage of time thus gives rise to a strong presumption of constitutionality. Pp. 16–21.

(b) The cross is a symbol closely linked to World War I. The United States adopted it as part of its military honors, establishing the Dis-

tinguished Service Cross and the Navy Cross in 1918 and 1919, respectively. And the fallen soldiers' final resting places abroad were marked by white crosses or Stars of David, a solemn image that became inextricably linked with and symbolic of the ultimate price paid by 116,000 soldiers. This relationship between the cross and the war may not have been the sole or dominant motivation for the design of the many war memorials that sprang up across the Nation, but that is all but impossible to determine today. The passage of time means that testimony from the decisionmakers may not be available. And regardless of the original purposes for erecting the monument, a community may wish to preserve it for very different reasons, such as the historic preservation and traffic-safety concerns noted here. The area surrounding a monument like the Bladensburg Cross may also have been altered in ways that change its meaning and provide new reasons for its preservation. Even the AHA recognizes that the monument's surroundings are important, as it concedes that the presence of a cross monument in a cemetery is unobjectionable. But a memorial's placement in a cemetery is not necessary to create the connection to those it honors. Memorials took the place of gravestones for those parents and other relatives who lacked the means to travel to Europe to visit the graves of their war dead and for those soldiers whose bodies were never recovered. Similarly, memorials and monuments honoring important historical figures *e.g.,* Dr. Martin Luther King, Jr., often include a symbol of the faith that was important to the persons whose lives are commemorated. Finally, as World War I monuments have endured through the years and become a familiar part of the physical and cultural landscape, requiring their removal or alteration would not be viewed by many as a neutral act. Few would say that California is attempting to convey a religious message by retaining the many city names, like Los Angeles and San Diego, given by the original Spanish settlers. But it would be something else entirely if the State undertook to change those names. Much the same is true about monuments to soldiers who sacrificed their lives for this country more than a century ago. Pp. 21–24.

(c) Applying these principles here, the Bladensburg Cross does not violate the Establishment Clause. The image of the simple wooden cross that originally marked the graves of American soldiers killed in World War I became a symbol of their sacrifice, and the design of the Bladensburg Cross must be understood in light of that background. That the cross originated as a Christian symbol and retains that meaning in many contexts does not change the fact that the symbol took on an added secular meaning when used in World War I memorials. The Cross has also acquired historical importance with the passage of time, reminding the townspeople of the deeds and sacrific-

es of their predecessors as it stands among memorials to veterans of later wars. It has thus become part of the community. It would not serve that role had its design deliberately disrespected area soldiers, but there is no evidence that the names of any area Jewish soldiers were either intentionally left off the memorial's list or included against the wishes of their families. The AHA tries to connect the Cross and the American Legion with anti-Semitism and the Ku Klux Klan, but the monument, which was dedicated during a period of heightened racial and religious animosity, includes the names of both Black and White soldiers; and both Catholic and Baptist clergy participated in the dedication. It is also natural and appropriate for a monument commemorating the death of particular individuals to invoke the symbols that signify what death meant for those who are memorialized. Excluding those symbols could make the memorial seem incomplete. This explains why Holocaust memorials invariably feature a Star of David or other symbols of Judaism and why the memorial at issue features the same symbol that marks the graves of so many soldiers near the battlefields where they fell. Pp. 28–30.

(d) The fact that the cross is undoubtedly a Christian symbol should not blind one to everything else that the Bladensburg Cross has come to represent: a symbolic resting place for ancestors who never returned home, a place for the community to gather and honor all veterans and their sacrifices for this Nation, and a historical landmark. For many, destroying or defacing the Cross would not be neutral and would not further the ideals of respect and tolerance embodied in the First Amendment. P. 31.

JUSTICE ALITO, joined by THE CHIEF JUSTICE, JUSTICE BREYER, and JUSTICE KAVANAUGH, concluded in Parts II–A and II–D:

(a) *Lemon* ambitiously attempted to fashion a test for all Establishment Clause cases. The test called on courts to examine the purposes and effects of a challenged government action, as well as any entanglement with religion that it might entail. The expectation of a ready framework has not been met, and the Court has many times either expressly declined to apply the test or simply ignored it. See, *e.g., Zobrest* v. *Catalina Foothills Sch. Dist.*, 509 U. S. 1; *Town of Greece* v. *Galloway*, 572 U. S. 565. Pp. 12–16.

(b) The *Lemon* Court ambitiously attempted to find a grand unified theory of the Establishment Clause, but the Court has since taken a more modest approach that focuses on the particular issue at hand and looks to history for guidance. The cases involving prayer before legislative sessions are illustrative. In *Marsh* v. *Chambers*, 463 U. S. 783, the Court upheld a State Legislature's practice of beginning each session with a prayer by an official chaplain, finding it highly persuasive that Congress for over 200 years had opened its sessions with a

prayer and that many state legislatures had followed suit. And the Court in *Town of Greece* reasoned that the historical practice of having, since the First Congress, chaplains in Congress showed "that the Framers considered legislative prayer a benign acknowledgment of religion's role in society." 572 U. S., at 576. Where monuments, symbols, and practices with a longstanding history follow in the tradition of the First Congress in respecting and tolerating different views, endeavoring to achieve inclusivity and nondiscrimination, and recognizing the important role religion plays in the lives of many Americans, they are likewise constitutional. Pp. 24–28.

   JUSTICE THOMAS, agreeing that the Bladensburg Cross is constitutional, concluded:

   (a) The text and history of the Clause—which reads "Congress shall make no law respecting an establishment of religion"—suggest that it should not be incorporated against the States. When the Court incorporated the Clause in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 15, it apparently did not consider that an incorporated Establishment Clause would prohibit exactly what the text of the Clause seeks to protect: state establishments of religion. The appropriate question is whether any longstanding right of citizenship restrains the States in the establishment context. Further confounding the incorporation question is the fact that the First Amendment by its terms applies only to "law[s]" enacted by "Congress." Pp. 1–3.

   (b) Even if the Clause applied to state and local governments in some fashion, "[t]he mere presence of the monument along [respondents'] path involves no [actual legal] coercion," the *sine qua non* of an establishment of religion. *Van Orden* v. *Perry*, 545 U. S. 677, 694 (opinion of THOMAS, J.). The plaintiff claiming an unconstitutional establishment of religion must demonstrate that he was actually coerced by government conduct that shares the characteristics of an establishment as understood at the founding. Respondents have not demonstrated that maintaining a religious display on public property shares any of the historical characteristics of an establishment of religion. *Town of Greece* v. *Galloway*, 572 U. S. 565, 608 (same). The Bladensburg Cross is constitutional even though the cross has religious significance. Religious displays or speech need not be limited to those considered nonsectarian. Insisting otherwise is inconsistent with this Nation's history and traditions, *id.,* at 578–580 (majority opinion), and would force the courts "to act as supervisors and censors of religious speech," *id.,* at 581. Pp. 3–5.

   (c) The plurality rightly rejects the relevance of the test set forth in *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613, to claims like this one, which involve religiously expressive monuments, symbols, displays, and similar practices, but JUSTICE THOMAS would take the logical

next step and overrule the *Lemon* test in all contexts. The test has no basis in the original meaning of the Constitution; it has "been manipulated to fit whatever result the Court aimed to achieve," *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844, 900 (Scalia, J., dissenting); and it continues to cause enormous confusion in the States and the lower courts. Pp. 6–7.

JUSTICE GORSUCH, joined by JUSTICE THOMAS, concludes that a suit like this one should be dismissed for lack of standing. Pp. 1–11.

(a) The American Humanist Association claims that its members come into regular, unwelcome contact with the Bladensburg Cross when they drive through the area, but this "offended observer" theory of standing has no basis in law. To establish standing to sue consistent with the Constitution, a plaintiff must show: (1) injury-in-fact, (2) causation, and (3) redressability. And the injury-in-fact must be "concrete and particularized." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560. This Court has already rejected the notion that offense alone qualifies as a "concrete and particularized" injury sufficient to confer standing, *Diamond* v. *Charles*, 476 U. S. 54, 62, and it has done so in the context of the Establishment Clause itself, see *Valley Forge Christian College* v. *Americans United for the Separation of Church and State*, 454 U. S. 464. Offended observer standing is deeply inconsistent, too, with many other longstanding principles and precedents, including the rule that " 'generalized grievances' about the conduct of Government" are insufficient to confer standing to sue, *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 217, and "the rule that a party 'generally must assert his own legal rights and interests,'" not those " 'of third parties,'" *Kowalski* v. *Tesmer*, 543 U. S. 125, 129. Pp. 1–6.

(b) Lower courts invented offended observer standing for Establishment Clause cases in response to *Lemon* v. *Kurtzman*, 403 U. S. 602, reasoning that if the Establishment Clause forbids anything that a reasonable observer would view as an endorsement of religion, then such an observer must be able to sue. *Lemon*, however, was a misadventure, and the Court today relies on a more modest, historically sensitive approach, interpreting the Establishment Clause with reference to historical practices and understandings. The monument here is clearly constitutional in light of the nation's traditions. Although the plurality does not say it in as many words, the message of today's decision for the lower courts must be this: whether a monument, symbol, or practice is old or new, apply *Town of Greece* v. *Galloway*, 572 U. S. 565, not *Lemon*, because what matters when it comes to assessing a monument, symbol, or practice is not its age but its compliance with ageless principles. Pp. 6–9.

(c) With *Lemon* now shelved, little excuse will remain for the

Syllabus

anomaly of offended observer standing, and the gaping hole it tore in standing doctrine in the courts of appeals should now begin to close. Abandoning offended observer standing will mean only a return to the usual demands of Article III, requiring a real controversy with real impact on real persons to make a federal case out of it. Pp. 9–11.

ALITO, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–B, II–C, III, and IV, in which ROBERTS, C. J., and BREYER, KAGAN, and KAVANAUGH, JJ., joined, and an opinion with respect to Parts II–A and II–D, in which ROBERTS, C. J., and BREYER and KAVANAUGH, JJ., joined. BREYER, J., filed a concurring opinion, in which KAGAN, J., joined. KAVANAUGH, J., filed a concurring opinion. KAGAN, J., filed an opinion concurring in part. THOMAS, J., filed an opinion concurring in the judgment. GORSUCH, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined. GINSBURG, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES
_____

Nos. 17–1717 and 18–18
_____

THE AMERICAN LEGION, ET AL., PETITIONERS
17–1717          *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.; AND

MARYLAND-NATIONAL CAPITAL PARK AND
PLANNING COMMISSION, PETITIONER
18–18          *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 20, 2019]

JUSTICE ALITO announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–B, II–C, III, and IV, and an opinion with respect to Parts II–A and II–D, in which THE CHIEF JUSTICE, JUSTICE BREYER, and JUSTICE KAVANAUGH join.

Since 1925, the Bladensburg Peace Cross (Cross) has stood as a tribute to 49 area soldiers who gave their lives in the First World War. Eighty-nine years after the dedication of the Cross, respondents filed this lawsuit, claiming that they are offended by the sight of the memorial on public land and that its presence there and the expenditure of public funds to maintain it violate the Establishment Clause of the First Amendment. To remedy this violation, they asked a federal court to order the relocation or demolition of the Cross or at least the removal of its

arms. The Court of Appeals for the Fourth Circuit agreed that the memorial is unconstitutional and remanded for a determination of the proper remedy. We now reverse.

Although the cross has long been a preeminent Christian symbol, its use in the Bladensburg memorial has a special significance. After the First World War, the picture of row after row of plain white crosses marking the overseas graves of soldiers who had lost their lives in that horrible conflict was emblazoned on the minds of Americans at home, and the adoption of the cross as the Bladensburg memorial must be viewed in that historical context. For nearly a century, the Bladensburg Cross has expressed the community's grief at the loss of the young men who perished, its thanks for their sacrifice, and its dedication to the ideals for which they fought. It has become a prominent community landmark, and its removal or radical alteration at this date would be seen by many not as a neutral act but as the manifestation of "a hostility toward religion that has no place in our Establishment Clause traditions." *Van Orden* v. *Perry*, 545 U. S. 677, 704 (2005) (BREYER, J., concurring in judgment). And contrary to respondents' intimations, there is no evidence of discriminatory intent in the selection of the design of the memorial or the decision of a Maryland commission to maintain it. The Religion Clauses of the Constitution aim to foster a society in which people of all beliefs can live together harmoniously, and the presence of the Bladensburg Cross on the land where it has stood for so many years is fully consistent with that aim.

## I

### A

The cross came into widespread use as a symbol of Christianity by the fourth century,[1] and it retains that meaning today. But there are many contexts in which the symbol

--------

[1] B. Longenecker, The Cross Before Constantine: The Early Life of a Christian Symbol 2 (2015).

has also taken on a secular meaning. Indeed, there are instances in which its message is now almost entirely secular.

A cross appears as part of many registered trademarks held by businesses and secular organizations, including Blue Cross Blue Shield, the Bayer Group, and some Johnson & Johnson products.[2] Many of these marks relate to health care, and it is likely that the association of the cross with healing had a religious origin. But the current use of these marks is indisputably secular.

The familiar symbol of the Red Cross—a red cross on a white background—shows how the meaning of a symbol that was originally religious can be transformed. The International Committee of the Red Cross (ICRC) selected that symbol in 1863 because it was thought to call to mind the flag of Switzerland, a country widely known for its neutrality.[3] The Swiss flag consists of a white cross on a red background. In an effort to invoke the message associated with that flag, the ICRC copied its design with the colors inverted. Thus, the ICRC selected this symbol for an essentially secular reason, and the current secular message of the symbol is shown by its use today in nations with only tiny Christian populations.[4] But the cross was originally chosen for the Swiss flag for religious reasons.[5]

——————

[2] See Blue Cross, Blue Shield, https://www.bcbs.com; The Bayer Group, The Bayer Cross—Logo and Landmark, https://www.bayer.com/en/logo-history.aspx; Band-Aid Brand Adhesive Bandages, Johnson & Johnson All Purpose First Aid Kit, https://www.band-aid.com/products/first-aid-kits/all-purpose (all Internet materials as last visited June 18, 2019).

[3] International Committee of the Red Cross, The History of the Emblems, https://www.icrc.org/en/doc/resources/documents/misc/emblem-history.htm.

[4] For example, the Indian and Japanese affiliates of the ICRC and Red Crescent Societies use the symbol of the cross. See Indian Red Cross Society, https://www.indianredcross.org/ircs/index.php; Japanese Red Cross Society, http://www.jrc.or.jp/english/.

[5] See "Flag of Switzerland," Britannica Academic, https://academic.eb.com/levels/collegiate/article/flag-of-Switzerland/93966.

So an image that began as an expression of faith was transformed.

The image used in the Bladensburg memorial—a plain Latin cross[6]—also took on new meaning after World War I. "During and immediately after the war, the army marked soldiers' graves with temporary wooden crosses or Stars of David"—a departure from the prior practice of marking graves in American military cemeteries with uniform rectangular slabs. G. Piehler, Remembering War the American Way 101 (1995); App. 1146. The vast majority of these grave markers consisted of crosses,[7] and thus when Americans saw photographs of these cemeteries, what struck them were rows and rows of plain white crosses. As a result, the image of a simple white cross "developed into a 'central symbol'" of the conflict. *Ibid.* Contemporary literature, poetry, and art reflected this powerful imagery. See Brief for Veterans of Foreign Wars of the United States et al. as *Amici Curiae* 10–16. Perhaps most famously, John McCrae's poem, In Flanders Fields, began with these memorable lines:

––––––––––

[6]The Latin form of the cross "has a longer upright than crossbar. The intersection of the two is usually such that the upper and the two horizontal arms are all of about equal length, but the lower arm is conspicuously longer." G. Ferguson, Signs & Symbols in Christian Art 294 (1954). See also Webster's Third New International Dictionary 1276 (1981) ("latin cross, n.": "a figure of a cross having a long upright shaft and a shorter crossbar traversing it above the middle").

[7]Of the roughly 116,000 casualties the United States suffered in World War I, some 3,500 were Jewish soldiers. J. Fredman & L. Falk, Jews in American Wars 100 (5th ed. 1954). In the congressional hearings involving the appropriate grave markers for those buried abroad, one Representative stated that approximately 1,600 of these Jewish soldiers were buried in overseas graves marked by Stars of David. See Hearings before the Committee on Military Affairs, 68th Cong., 1st Sess., 3 (1924). That would constitute about 5.2% of the 30,973 graves in American World War I cemeteries abroad. See American Battle Monuments Commission (ABMC), World War I Burials and Memorializations, https://www.abmc.gov/node/1273.

"In Flanders fields the poppies blow
Between the crosses, row on row."

In Flanders Fields and Other Poems 3 (G. P. Putnam's Sons ed. 1919). The poem was enormously popular. See P. Fussell, The Great War and Modern Memory 248–249 (1975). A 1921 New York Times article quoted a description of McCrae's composition as "'the poem of the army'" and "'of all those who understand the meaning of the great conflict.'"[8] The image of "the crosses, row on row," stuck in people's minds, and even today for those who view World War I cemeteries in Europe, the image is arresting.[9]

After the 1918 armistice, the War Department announced plans to replace the wooden crosses and Stars of David with uniform marble slabs like those previously used in American military cemeteries. App. 1146. But the public outcry against that proposal was swift and fierce. Many organizations, including the American War Mothers, a nonsectarian group founded in 1917, urged the Department to retain the design of the temporary markers. *Id.*, at 1146–1147. When the American Battle Monuments Commission took over the project of designing the headstones, it responded to this public sentiment by opting to replace the wooden crosses and Stars of David with marble versions of those symbols. *Id.*, at 1144. A Member of Congress likewise introduced a resolution noting that "these wooden symbols have, during and since the World War, been regarded as emblematic of the great sacrifices which that war entailed, have been so treated by poets and artists and have become peculiarly and inseparably associated in the thought of surviving relatives and comrades and of the Nation with these World War graves." H. Res. 15, 68th Cong., 1 (1924), App. 1163–1164. This na-

———————

    [8] "In Flanders Fields," N. Y. Times, Dec. 18, 1921, p. 96.
    [9] See ABMC, Cemeteries and Memorials, https://www.abmc.gov/cemeteries-memorials.

tional debate and its outcome confirmed the cross's wide-spread resonance as a symbol of sacrifice in the war.

B

Recognition of the cross's symbolism extended to local communities across the country. In late 1918, residents of Prince George's County, Maryland, formed a committee for the purpose of erecting a memorial for the county's fallen soldiers. App. 988–989, 1014. Among the committee's members were the mothers of 10 deceased soldiers. *Id.,* at 989. The committee decided that the memorial should be a cross and hired sculptor and architect John Joseph Earley to design it. Although we do not know precisely why the committee chose the cross, it is unsurprising that the committee—and many others commemorating World War I[10]—adopted a symbol so widely associated with that wrenching event.

After selecting the design, the committee turned to the task of financing the project. The committee held fund-raising events in the community and invited donations, no matter the size, with a form that read:

> "We, the citizens of Maryland, trusting in God, the Supreme Ruler of the Universe, Pledge Faith in our Brothers who gave their all in the World War to make [the] World Safe for Democracy. Their Mortal Bodies have turned to dust, but their spirit Lives to guide us through Life in the way of Godliness, Justice and Liberty.
>
> "With our Motto, 'One God, One Country, and One Flag' We contribute to this Memorial Cross Commem-

---

[10] Other World War I memorials that incorporate the cross include the Argonne Cross and the Canadian Cross of Sacrifice in Arlington National Cemetery; the Wayside Cross in Towson, Maryland; the Wayside Cross in New Canaan, Connecticut; the Troop K Georgia Cavalry War Memorial Front in Augusta, Georgia; the Chestnut Hill and Mt. Airy World War Memorial in Philadelphia, Pennsylvania; and the Great War for Democracy Memorial in Waterbury, Connecticut.

orating the Memory of those who have not Died in Vain." *Id.*, at. 1251.

Many of those who responded were local residents who gave small amounts: Donations of 25 cents to 1 dollar were the most common. *Id.*, at 1014. Local businesses and political leaders assisted in this effort. *Id.,* at 1014, 1243. In writing to thank United States Senator John Walter Smith for his donation, committee treasurer Mrs. Martin Redman explained that "[t]he chief reason I feel as deeply in this matter [is that], my son, [Wm.] F. Redman, lost his life in France and because of that I feel that our memorial cross is, in a way, his grave stone." *Id.*, at 1244.

The Cross was to stand at the terminus of another World War I memorial—the National Defense Highway, which connects Washington to Annapolis. The community gathered for a joint groundbreaking ceremony for both memorials on September 28, 1919; the mother of the first Prince George's County resident killed in France broke ground for the Cross. *Id.*, at 910. By 1922, however, the committee had run out of funds, and progress on the Cross had stalled. The local post of the American Legion took over the project, and the monument was finished in 1925.

The completed monument is a 32-foot tall Latin cross that sits on a large pedestal. The American Legion's emblem is displayed at its center, and the words "Valor," "Endurance," "Courage," and "Devotion" are inscribed at its base, one on each of the four faces. The pedestal also features a 9- by 2.5-foot bronze plaque explaining that the monument is "Dedicated to the heroes of Prince George's County, Maryland who lost their lives in the Great War for the liberty of the world." *Id.*, at 915 (capitalization omitted). The plaque lists the names of 49 local men, both Black and White, who died in the war. It identifies the dates of American involvement, and quotes President Woodrow Wilson's request for a declaration of war: "The

right is more precious than peace. We shall fight for the things we have always carried nearest our hearts. To such a task we dedicate our lives." *Ibid.*

At the dedication ceremony, a local Catholic priest offered an invocation. *Id.,* at 217–218. United States Representative Stephen W. Gambrill delivered the keynote address, honoring the "'men of Prince George's County'" who "'fought for the sacred right of all to live in peace and security.'" *Id.*, at 1372. He encouraged the community to look to the "'token of this cross, symbolic of Calvary,'" to "'keep fresh the memory of our boys who died for a righteous cause.'" *Ibid.* The ceremony closed with a benediction offered by a Baptist pastor.

Since its dedication, the Cross has served as the site of patriotic events honoring veterans, including gatherings on Veterans Day, Memorial Day, and Independence Day. Like the dedication itself, these events have typically included an invocation, a keynote speaker, and a benediction. *Id.*, at 182, 319–323. Over the years, memorials honoring the veterans of other conflicts have been added to the surrounding area, which is now known as Veterans Memorial Park. These include a World War II Honor Scroll; a Pearl Harbor memorial; a Korea-Vietnam veterans memorial; a September 11 garden; a War of 1812 memorial; and two recently added 38-foot-tall markers depicting British and American soldiers in the Battle of Bladensburg. *Id.*, at 891–903, 1530. Because the Cross is located on a traffic island with limited space, the closest of these other monuments is about 200 feet away in a park across the road. *Id.*, at 36, 44.

As the area around the Cross developed, the monument came to be at the center of a busy intersection. In 1961, the Maryland-National Capital Park and Planning Commission (Commission) acquired the Cross and the land on which it sits in order to preserve the monument and ad-

dress traffic-safety concerns.[11]    *Id.*, at 420–421, 1384–
1387.  The American Legion reserved the right to continue
using the memorial to host a variety of ceremonies, includ-
ing events in memory of departed veterans.  *Id.*, at 1387.
Over the next five decades, the Commission spent approx-
imately $117,000 to maintain and preserve the monu-
ment.   In 2008, it budgeted an additional $100,000 for
renovations and repairs to the Cross.[12]

## C

In 2012, nearly 90 years after the Cross was dedicated
and more than 50 years after the Commission acquired it,
the American Humanist Association (AHA) lodged a com-
plaint with the Commission.  The complaint alleged that
the Cross's presence on public land and the Commission's
maintenance of the memorial violate the Establishment

───────────

[11] There is some ambiguity as to whether the American Legion ever
owned the land on which the Cross rests.  When the Legion took over
the Cross, the town of Bladensburg passed a resolution "assign[ing] and
grant[ing] to the said Snyder-Farmer Post #3, American Legion, that
parcel of ground upon which the cross now stands and that part neces-
sary to complete . . . the park around said cross, to the perpetual care of
the Snyder-Farmer Post #3 as long as it is in existence, and should the
said Post go out of existence the plot to revert to the Town of Bladens-
burg, together with the cross and its surroundings." App. 65.  In 1935,
a statute authorized the State Roads Commission of Maryland to
"investigate the ownership and possessory rights" of the tract surround-
ing the Cross and to "acquire the same by purchase or condemnation."
*Id.*, at 421.  It appears that in 1957, a court determined that it was
necessary for the State to condemn the property.  *Id.*, at 1377–1379.
The State Roads Commission thereafter conveyed the property to the
Commission in 1960.  *Id.*, at 1380, 1382.  To resolve any ambiguities, in
1961, the local American Legion post "transfer[ed] and assign[ed] to
[the Commission] all its right, title and interest in and to the Peace
Cross, also originally known as the Memorial Cross, and the tract upon
which it is located." *Id.*, at 1387.  At least by 1961, then, both the land
and the Cross were publicly owned.

[12] Of the budgeted $100,000, the Commission had spent only $5,000
as of 2015.  The Commission put off additional spending and repairs in
light of this lawsuit. *Id.,* at 823.

Clause of the First Amendment. *Id.,* at 1443–1451. The AHA, along with three residents of Washington, D. C., and Maryland, also sued the Commission in the District Court for the District of Maryland, making the same claim. The AHA sought declaratory and injunctive relief requiring "removal or demolition of the Cross, or removal of the arms from the Cross to form a non-religious slab or obelisk." 874 F. 3d 195, 202, n. 7 (CA4 2017) (internal quotation marks omitted). The American Legion intervened to defend the Cross.

The District Court granted summary judgment for the Commission and the American Legion. The Cross, the District Court held, satisfies both the three-pronged test announced in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971)*,* and the analysis applied by JUSTICE BREYER in upholding the Ten Commandments monument at issue in *Van Orden* v. *Perry*, 545 U. S. 677. Under the *Lemon* test, a court must ask whether a challenged government action (1) has a secular purpose; (2) has a "principal or primary effect" that "neither advances nor inhibits religion"; and (3) does not foster "an excessive government entanglement with religion," 403 U. S., at 612–613 (internal quotation marks omitted). Applying that test, the District Court determined that the Commission had secular purposes for acquiring and maintaining the Cross—namely, to commemorate World War I and to ensure traffic safety. The court also found that a reasonable observer aware of the Cross's history, setting, and secular elements "would not view the Monument as having the effect of impermissibly endorsing religion." 147 F. Supp. 3d 373, 387 (Md. 2015). Nor, according to the court, did the Commission's maintenance of the memorial create the kind of "continued and repeated government involvement with religion" that would constitute an excessive entanglement. *Ibid.* (internal quotation marks and emphasis omitted). Finally, in light of the factors that informed its analysis of *Lemon*'s "effects" prong, the court concluded that the Cross is

constitutional under JUSTICE BREYER's approach in *Van Orden.* 147 F. Supp. 3d, at 388–390.

A divided panel of the Court of Appeals for the Fourth Circuit reversed. The majority relied primarily on the *Lemon* test but also took cognizance of JUSTICE BREYER's *Van Orden* concurrence. While recognizing that the Commission acted for a secular purpose, the court held that the Bladensburg Cross failed *Lemon*'s "effects" prong because a reasonable observer would view the Commission's ownership and maintenance of the monument as an endorsement of Christianity. The court emphasized the cross's "inherent religious meaning" as the "'preeminent symbol of Christianity.'" 874 F. 3d, at 206–207. Although conceding that the monument had several "secular elements," the court asserted that they were "overshadow[ed]" by the Cross's size and Christian connection— especially because the Cross's location and condition would make it difficult for "passers-by" to "read" or otherwise "examine" the plaque and American Legion emblem. *Id.,* at 209–210. The court rejected as "too simplistic" an argument defending the Cross's constitutionality on the basis of its 90-year history, suggesting that "[p]erhaps the longer a violation persists, the greater the affront to those offended." *Id.,* at 208. In the alternative, the court concluded, the Commission had become excessively entangled with religion by keeping a display that "aggrandizes the Latin cross" and by spending more than *de minimis* public funds to maintain it. *Id.,* at 211–212.

Chief Judge Gregory dissented in relevant part, contending that the majority misapplied the "effects" test by failing to give adequate consideration to the Cross's "physical setting, history, and usage." *Id.,* at 218 (opinion concurring in part and dissenting in part). He also disputed the majority's excessive-entanglement analysis, noting that the Commission's maintenance of the Cross was not the kind of "comprehensive, discriminating, and continuing state surveillance" of religion that *Lemon* was con-

cerned to rule out.  874 F. 3d, at 221 (internal quotation marks omitted).

The Fourth Circuit denied rehearing en banc over dissents by Chief Judge Gregory, Judge Wilkinson, and Judge Niemeyer.  891 F. 3d 117 (2018).  The Commission and the American Legion each petitioned for certiorari. We granted the petitions and consolidated them for argument.  586 U. S. ___ (2016).

## II
### A

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion."  While the concept of a formally established church is straightforward, pinning down the meaning of a "law respecting an establishment of religion" has proved to be a vexing problem.  Prior to the Court's decision in *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1 (1947), the Establishment Clause was applied only to the Federal Government, and few cases involving this provision came before the Court.  After *Everson* recognized the incorporation of the Clause, however, the Court faced a steady stream of difficult and controversial Establishment Clause issues, ranging from Bible reading and prayer in the public schools, *Engel* v. *Vitale*, 370 U. S. 421 (1962); *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203 (1963), to Sunday closing laws, *McGowan* v. *Maryland*, 366 U. S. 420 (1961), to state subsidies for church-related schools or the parents of students attending those schools, *Board of Ed. of Central School Dist. No. 1* v. *Allen*, 392 U. S. 236 (1968); *Everson, supra.*  After grappling with such cases for more than 20 years, *Lemon* ambitiously attempted to distill from the Court's existing case law a test that would bring order and predictability to Establishment Clause decisionmaking.  That test, as noted, called on courts to examine the purposes and effects of a

challenged government action, as well as any entanglement with religion that it might entail. *Lemon*, 403 U. S., at 612–613. The Court later elaborated that the "effect[s]" of a challenged action should be assessed by asking whether a "reasonable observer" would conclude that the action constituted an "endorsement" of religion. *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 592 (1989); *id.,* at 630 (O'Connor, J., concurring in part and concurring in judgment).

If the *Lemon* Court thought that its test would provide a framework for all future Establishment Clause decisions, its expectation has not been met. In many cases, this Court has either expressly declined to apply the test or has simply ignored it. See *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. 1 (1993); *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet*, 512 U. S. 687 (1994); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995); *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753 (1995); *Good News Club* v. *Milford Central School*, 533 U. S. 98 (2001); *Zelman* v. *Simmons-Harris*, 536 U. S. 639 (2002); *Cutter* v. *Wilkinson*, 544 U. S. 709 (2005); *Van Orden*, 545 U. S. 677; *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171 (2012); *Town of Greece* v. *Galloway*, 572 U. S. 565 (2014); *Trump* v. *Hawaii*, 585 U. S. \_\_\_ (2018).

This pattern is a testament to the *Lemon* test's shortcomings. As Establishment Clause cases involving a great array of laws and practices came to the Court, it became more and more apparent that the *Lemon* test could not resolve them. It could not "explain the Establishment Clause's tolerance, for example, of the prayers that open legislative meetings, . . . certain references to, and invocations of, the Deity in the public words of public officials; the public references to God on coins, decrees, and buildings; or the attention paid to the religious objectives of

certain holidays, including Thanksgiving." *Van Orden*, *supra*, at 699 (opinion of BREYER, J.). The test has been harshly criticized by Members of this Court,[13] lamented by lower court judges,[14] and questioned by a diverse roster of scholars.[15]

———————

[13] See, *e.g.*, *Utah Highway Patrol Assn.* v. *American Atheists, Inc.*, 565 U. S. 994, 995 (2011) (THOMAS, J., dissenting from denial of certiorari); *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 655–656 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part); *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 398–399 (1993) (Scalia, J., concurring in judgment); *Wallace* v. *Jaffree*, 472 U. S. 38, 112 (1985) (Rehnquist, J., dissenting).

[14] See, *e.g., Green* v. *Haskell Cty. Bd. of Comm'rs*, 574 F. 3d 1235, n. 1 (CA10 2009) (Kelly, J., dissenting from denial of rehearing en banc) (discussing the "judicial morass resulting from the Supreme Court's opinions"); *Cooper* v. *United States Postal Service*, 577 F. 3d 479, 494 (CA2 2009) ("*Lemon* is difficult to apply and not a particularly useful test"); *Roark* v. *South Iron R–1 School Dist.*, 573 F. 3d 556, 563 (CA8 2009) ("[T]he *Lemon* test has had a 'checkered career' "); *Skoros* v. *New York*, 437 F. 3d 1, 15 (CA2 2006) (government officials "confront a 'jurisprudence of minutiae' that leaves them to rely on 'little more than intuition and a tape measure' to ensure the constitutionality of public holiday displays" (quoting *County of Allegheny*, *supra*, at 674–675 (opinion of Kennedy, J.)); *Felix* v. *Bloomfield*, 841 F. 3d 848, 864 (CA10 2016) (court "cannot speculate what precise actions a government must take" to comply with the Establishment Clause); *Separation of Church and State Comm.* v. *Eugene*, 93 F. 3d 617, 627 (CA9 1996) (O'Scannlain, J., concurring in result) (The standards announced by this Court "are not always clear, consistent or coherent").

[15] See McConnell, Religious Freedom at a Crossroads, 59 U. Chi. L. Rev. 115, 118–120 (1992) (describing doctrinal "chaos" *Lemon* created, allowing the Court to "reach almost any result in almost any case"); Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373, 1380–1388 (1981) (criticizing the "unstructured expansiveness of the entanglement notion" and the potential that certain constructions of the effects prong may result in "the establishment clause threaten[ing] to swallow the free exercise clause"); Smith, Symbols, Perceptions, and Doctrinal Illusions: Establishment Neutrality and the "No Endorsement" Test, 86 Mich. L. Rev. 266, 269 (1987)

For at least four reasons, the *Lemon* test presents particularly daunting problems in cases, including the one now before us, that involve the use, for ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations.[16]  Together, these considera-

_____

(criticizing both the *Lemon* test and the endorsement gloss); Tushnet, Reflections on the Role of Purpose in the Jurisprudence of the Religion Clauses, 27 Wm. & Mary L. Rev. 997, 1004 (1986) (describing cases involving "'deeply ingrained practices'" as "not readily susceptible to analysis under the ordinary *Lemon* approach"); Choper, The Endorsement Test: Its Status and Desirability, 18 J. L. & Politics 499 (2002) (criticizing both *Lemon* and the endorsement gloss); Paulsen, Religion, Equality, and the Constitution: An Equal Protection Approach to Establishment Clause Adjudication, 61 Notre Dame L. Rev. 311, 315 (1986) (criticizing the Court's reading of the Establishment Clause as "producing a schizophrenic pattern of decisions"); Marshall, "We Know It When We See It": The Supreme Court and Establishment, 59 S. Cal. L. Rev. 495, 526 (1986) (explaining that the purpose prong of *Lemon*, "[t]aken to its logical conclusion . . . suggests that laws which respect free exercise rights . . . are unconstitutional").

[16] While we do not attempt to provide an authoritative taxonomy of the dozens of Establishment Clause cases that the Court has decided since *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1 (1947), most can be divided into six rough categories: (1) religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies, *e.g.*, *Lynch* v. *Donnelly*, 465 U. S. 668 (1984); *Van Orden* v. *Perry*, 545 U. S. 677 (2005); (2) religious accommodations and exemptions from generally applicable laws, *e.g.*, *Cutter* v. *Wilkinson*, 544 U. S. 709 (2005); *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327 (1987); (3) subsidies and tax exemptions, *e.g.*, *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664 (1970); *Zelman* v. *Simmons-Harris*, 536 U. S. 639 (2002); (4) religious expression in public schools, *e.g.*, *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203 (1963); *Lee* v. *Weisman*, 505 U. S. 577 (1992); (5) regulation of private religious speech, *e.g.*, *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753 (1995); and (6) state interference with internal church affairs, *e.g., Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171 (2012).  A final, miscellaneous category, including cases involving such issues as Sunday closing laws, see *McGowan*, v. *Maryland*, 366 U. S. 420 (1961), and church involvement in governmental decisionmaking, see *Larkin* v.

tions counsel against efforts to evaluate such cases under *Lemon* and toward application of a presumption of constitutionality for longstanding monuments, symbols, and practices.

B

*First*, these cases often concern monuments, symbols, or practices that were first established long ago, and in such cases, identifying their original purpose or purposes may be especially difficult. In *Salazar* v. *Buono*, 559 U. S. 700 (2010), for example, we dealt with a cross that a small group of World War I veterans had put up at a remote spot in the Mojave Desert more than seven decades earlier. The record contained virtually no direct evidence regarding the specific motivations of these men. We knew that they had selected a plain white cross, and there was some evidence that the man who looked after the monument for many years—"a miner who had served as a medic and had thus presumably witnessed the carnage of the war firsthand"—was said not to have been "particularly religious." *Id.*, at 724 (ALITO, J., concurring in part and concurring in judgment).

Without better evidence about the purpose of the monument, different Justices drew different inferences. The plurality thought that this particular cross was meant "to commemorate American servicemen who had died in World War I" and was not intended "to promote a Christian message." *Id.,* at 715. The dissent, by contrast, "presume[d]" that the cross's purpose "was a Christian one, at least in part, for the simple reason that those who erected the cross chose to commemorate American veterans in an explicitly Christian manner." *Id.,* at 752 (opinion of Stevens, J.). The truth is that 70 years after the

---

*Grendel's Den, Inc.*, 459 U. S. 116 (1982); *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet*, 512 U. S. 687 (1994), might be added. We deal here with an issue that falls into the first category.

fact, there was no way to be certain about the motivations of the men who were responsible for the creation of the monument. And this is often the case with old monuments, symbols, and practices. Yet it would be inappropriate for courts to compel their removal or termination based on supposition.

*Second*, as time goes by, the purposes associated with an established monument, symbol, or practice often multiply. Take the example of Ten Commandments monuments, the subject we addressed in *Van Orden,* 545 U. S. 677, and *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844 (2005). For believing Jews and Christians, the Ten Commandments are the word of God handed down to Moses on Mount Sinai, but the image of the Ten Commandments has also been used to convey other meanings. They have historical significance as one of the foundations of our legal system, and for largely that reason, they are depicted in the marble frieze in our courtroom and in other prominent public buildings in our Nation's capital. See *Van Orden*, *supra*, at 688–690. In *Van Orden* and *McCreary*, no Member of the Court thought that these depictions are unconstitutional. 545 U. S., at 688–690; *id.*, at 701 (opinion of BREYER, J.); *id.,* at 740 (Souter, J., dissenting).

Just as depictions of the Ten Commandments in these public buildings were intended to serve secular purposes, the litigation in *Van Orden* and *McCreary* showed that secular motivations played a part in the proliferation of Ten Commandments monuments in the 1950s. In 1946, Minnesota Judge E. J. Ruegemer proposed that the Ten Commandments be widely disseminated as a way of combating juvenile delinquency.[17] With this prompting, the

———————

[17] See Bravin, When Moses' Laws Run Afoul of the U. S.'s, Get Me Cecil B. deMille—Ten Commandment Memorial Has Novel Defense in Suit, Wall Street Journal, Apr. 18, 2001, p. A1.

Fraternal Order of the Eagles began distributing paper copies of the Ten Commandments to churches, school groups, courts, and government offices. The Eagles, "while interested in the religious aspect of the Ten Commandments, sought to highlight the Commandments' role in shaping civic morality." *Van Orden, supra*, at 701 (opinion of BREYER, J.). At the same time, Cecil B. DeMille was filming The Ten Commandments.[18] He learned of Judge Ruegemer's campaign, and the two collaborated, deciding that the Commandments should be carved on stone tablets and that DeMille would make arrangements with the Eagles to help pay for them, thus simultaneously promoting his film and public awareness of the Decalogue. Not only did DeMille and Judge Ruegemer have different purposes, but the motivations of those who accepted the monuments and those responsible for maintaining them may also have differed. As we noted in *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 476 (2009), "the thoughts or sentiments expressed by a government entity that accepts and displays [a monument] may be quite different from those of either its creator or its donor."

   The existence of multiple purposes is not exclusive to longstanding monuments, symbols, or practices, but this phenomenon is more likely to occur in such cases. Even if the original purpose of a monument was infused with religion, the passage of time may obscure that sentiment. As our society becomes more and more religiously diverse, a community may preserve such monuments, symbols, and practices for the sake of their historical significance or their place in a common cultural heritage. Cf. *Schempp*, 374 U. S., at 264–265 (Brennan, J., concurring) ("[The] government may originally have decreed a Sunday day of

––––––––

[18]See D. Davis, The Oxford Handbook of Church and State in the United States 284 (2010).

rest for the impermissible purpose of supporting religion
but abandoned that purpose and retained the laws for the
permissible purpose of furthering overwhelmingly secular
ends").

*Third,* just as the purpose for maintaining a monument,
symbol, or practice may evolve, "[t]he 'message' conveyed
. . . may change over time." *Summum*, 555 U. S., at 477.
Consider, for example, the message of the Statue of Lib-
erty, which began as a monument to the solidarity and
friendship between France and the United States and only
decades later came to be seen "as a beacon welcoming
immigrants to a land of freedom." *Ibid.*

With sufficient time, religiously expressive monuments,
symbols, and practices can become embedded features of a
community's landscape and identity. The community may
come to value them without necessarily embracing their
religious roots. The recent tragic fire at Notre Dame in
Paris provides a striking example. Although the French
Republic rigorously enforces a secular public square,[19] the
cathedral remains a symbol of national importance to the
religious and nonreligious alike. Notre Dame is funda-
mentally a place of worship and retains great religious
importance, but its meaning has broadened. For many, it
is inextricably linked with the very idea of Paris and
France.[20] Speaking to the nation shortly after the fire,
President Macron said that Notre Dame "'is our history,
our literature, our imagination. The place where we sur-
vived epidemics, wars, liberation. It has been the epicen-
ter of our lives.'"[21]

In the same way, consider the many cities and towns

––––––––––

[19] See French Constitution, Art. 1 (proclaiming that France is a "secu-
lar . . . Republic").

[20] See Erlanger, What the Notre-Dame Fire Reveals About the Soul of
France, N. Y. Times, Apr. 16, 2019.

[21] Hinnant, Petrequin, & Ganley, Fire Ravages Soaring Notre Dame
Cathedral, Paris Left Aghast, AP News, Apr. 16, 2019.

across the United States that bear religious names. Religion undoubtedly motivated those who named Bethlehem, Pennsylvania; Las Cruces, New Mexico; Providence, Rhode Island; Corpus Christi, Texas; Nephi, Utah, and the countless other places in our country with names that are rooted in religion. Yet few would argue that this history requires that these names be erased from the map. Or take a motto like Arizona's, "*Ditat Deus*" ("God enriches"), which was adopted in 1864,[22] or a flag like Maryland's, which has included two crosses since 1904.[23] Familiarity itself can become a reason for preservation.

*Fourth*, when time's passage imbues a religiously expressive monument, symbol, or practice with this kind of familiarity and historical significance, removing it may no longer appear neutral, especially to the local community for which it has taken on particular meaning. A government that roams the land, tearing down monuments with religious symbolism and scrubbing away any reference to the divine will strike many as aggressively hostile to religion. Militantly secular regimes have carried out such projects in the past,[24] and for those with a knowledge of

---

[22] See B. Shearer & B. Shearer, State Names, Seals, Flags, and Symbols: A Historical Guide 17–18 (3d ed. 2002). See also *id.,* at 18 (Connecticut motto: "*Qui Tanstulit Sustinet*" ("He Who Transplanted Still Sustains"), dating back to the colonial era and adapted from the Book of Psalms 79:3); *ibid.* (Florida motto: "In God We Trust," adopted in 1868); *id.,* at 20 (Maryland motto: "*Scuto Bonae Volantatis Tuae Coronasti Nos*" ("With Favor Wilt Thou Compass Us as with a Shield"), which appeared on the seal adopted in 1876 and comes from Psalms 5:12); *id.,* at 21–22 (Ohio motto: "With God, All Things Are Possible," adopted in 1959 and taken from Matthew 19:26); *id.,* at 22 (South Dakota motto: "Under God the People Rule," adopted in 1885); *id.,* at 23 (American Samoa motto: "*Samoa—Muamua le Atua*" ("Samoa—Let God Be First"), adopted in 1975).

[23] The current flag was known and used since at least October 1880, and was officially adopted by the General Assembly in 1904. See History of the Maryland Flag, https://sos.maryland.gov/Pages/Services/Flag-History.aspx.

[24] For example, the French Revolution sought to "dechristianize" the

history, the image of monuments being taken down will be evocative, disturbing, and divisive. Cf. *Van Orden*, 545 U. S., at 704 (opinion of BREYER, J.) ("[D]isputes concerning the removal of longstanding depictions of the Ten Commandments from public buildings across the Nation . . . could thereby create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid").

These four considerations show that retaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones. The passage of time gives rise to a strong presumption of constitutionality.

### C

The role of the cross in World War I memorials is illustrative of each of the four preceding considerations. Immediately following the war, "[c]ommunities across America built memorials to commemorate those who had served the nation in the struggle to make the world safe for democracy." G. Piehler, The American Memory of War, App. 1124. Although not all of these communities included a cross in their memorials, the cross had become a symbol closely linked to the war. "[T]he First World War witnessed a dramatic change in . . . the symbols used to commemorate th[e] service" of the fallen soldiers. *Id.*, at 1123. In the wake of the war, the United States adopted the cross as part of its military honors, establishing the Distinguished Service Cross and the Navy Cross in 1918 and

_____

nation and thus removed "plate[s], statues and other fittings from places of worship," destroyed "crosses, bells, shrines and other, 'external signs of worship,'" and altered "personal and place names which had any ecclesiastical connotations to more suitably Revolutionary ones." Tallett, Dechristianizing France: The Year II and the Revolutionary Experience, in Religion, Society and Politics in France Since 1789, pp. 1–2 (F. Tallett & N. Atkin eds. 1991).

1919, respectively.  See *id.*, at 147–148.  And as already noted, the fallen soldiers' final resting places abroad were marked by white crosses or Stars of David.  The solemn image of endless rows of white crosses became inextricably linked with and symbolic of the ultimate price paid by 116,000 soldiers.  And this relationship between the cross and the war undoubtedly influenced the design of the many war memorials that sprang up across the Nation.

This is not to say that the cross's association with the war was the sole or dominant motivation for the inclusion of the symbol in every World War I memorial that features it.  But today, it is all but impossible to tell whether that was so.  The passage of time means that testimony from those actually involved in the decisionmaking process is generally unavailable, and attempting to uncover their motivations invites rampant speculation.  And no matter what the original purposes for the erection of a monument, a community may wish to preserve it for very different reasons, such as the historic preservation and traffic-safety concerns the Commission has pressed here.

In addition, the passage of time may have altered the area surrounding a monument in ways that change its meaning and provide new reasons for its preservation.  Such changes are relevant here, since the Bladensburg Cross now sits at a busy traffic intersection, and numerous additional monuments are located nearby.

Even the AHA recognizes that there are instances in which a war memorial in the form of a cross is unobjectionable.  The AHA is not offended by the sight of the Argonne Cross or the Canadian Cross of Sacrifice, both Latin crosses commemorating World War I that rest on public grounds in Arlington National Cemetery.  The difference, according to the AHA, is that their location in a cemetery gives them a closer association with individual gravestones and interred soldiers.  See Brief for Respondents 96; Tr. of Oral Arg. 52.

But a memorial's placement in a cemetery is not necessary to create such a connection. The parents and other relatives of many of the war dead lacked the means to travel to Europe to visit their graves, and the bodies of approximately 4,400 American soldiers were either never found or never identified.[25] Thus, for many grieving relatives and friends, memorials took the place of gravestones. Recall that the mother of one of the young men memorialized by the Bladensburg Cross thought of the memorial as, "in a way, his grave stone." App. 1244. Whether in a cemetery or a city park, a World War I cross remains a memorial to the fallen.

Similar reasoning applies to other memorials and monuments honoring important figures in our Nation's history. When faith was important to the person whose life is commemorated, it is natural to include a symbolic reference to faith in the design of the memorial. For example, many memorials for Dr. Martin Luther King, Jr., make reference to his faith. Take the Martin Luther King, Jr. Civil Rights Memorial Park in Seattle, which contains a sculpture in three segments representing "both the Christian Trinity and the union of the family."[26] In Atlanta, the Ebenezer Baptist Church sits on the grounds of the Martin Luther King, Jr. National Historical Park. National Statuary Hall in the Capitol honors a variety of religious figures: for example, Mother Joseph Pariseau kneeling in prayer; Po'Pay, a Pueblo religious leader with symbols of the Pueblo religion; Brigham Young, president of the Church of Jesus Christ of Latter-day Saints; and Father Eusebio Kino with a crucifix around his neck and his hand raised in blessing.[27] These monuments honor men and

—————

[25] See App. 141, 936; M. Sledge, Soldier Dead 67 (2005).

[26] Local Memorials Honoring Dr. King, https://www.kingcounty.gov/elected/executive/equity-social-justice/mlk/local-memorials.aspx.

[27] The National Statuary Hall Collection, https://www.aoc.gov/the-national-statuary-hall-collection.

women who have played an important role in the history of our country, and where religious symbols are included in the monuments, their presence acknowledges the centrality of faith to those whose lives are commemorated.

Finally, as World War I monuments have endured through the years and become a familiar part of the physical and cultural landscape, requiring their removal would not be viewed by many as a neutral act. And an alteration like the one entertained by the Fourth Circuit—amputating the arms of the Cross, see 874 F. 3d, at 202, n. 7—would be seen by many as profoundly disrespectful. One member of the majority below viewed this objection as inconsistent with the claim that the Bladensburg Cross serves secular purposes, see 891 F. 3d, at 121 (Wynn, J., concurring in denial of en banc), but this argument misunderstands the complexity of monuments. A monument may express many purposes and convey many different messages, both secular and religious. Cf. *Van Orden*, 545 U. S., at 690 (plurality opinion) (describing simultaneous religious and secular meaning of the Ten Commandments display). Thus, a campaign to obliterate items with religious associations may evidence hostility to religion even if those religious associations are no longer in the forefront.

For example, few would say that the State of California is attempting to convey a religious message by retaining the names given to many of the State's cities by their original Spanish settlers—San Diego, Los Angeles, Santa Barbara, San Jose, San Francisco, etc. But it would be something else entirely if the State undertook to change all those names. Much the same is true about monuments to soldiers who sacrificed their lives for this country more than a century ago.

D

While the *Lemon* Court ambitiously attempted to find a grand unified theory of the Establishment Clause, in later

cases, we have taken a more modest approach that focuses on the particular issue at hand and looks to history for guidance. Our cases involving prayer before a legislative session are an example.

In *Marsh* v. *Chambers*, 463 U. S. 783 (1983), the Court upheld the Nebraska Legislature's practice of beginning each session with a prayer by an official chaplain, and in so holding, the Court conspicuously ignored *Lemon* and did not respond to Justice Brennan's argument in dissent that the legislature's practice could not satisfy the *Lemon* test. *Id.*, at 797–801. Instead, the Court found it highly persuasive that Congress for more than 200 years had opened its sessions with a prayer and that many state legislatures had followed suit. *Id.*, at 787–788. We took a similar approach more recently in *Town of Greece*, 572 U. S., at 577.

We reached these results even though it was clear, as stressed by the *Marsh* dissent, that prayer is by definition religious. See *Marsh*, *supra*, at 797–798 (opinion of Brennan, J.). As the Court put it in *Town of Greece*: "*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." 572 U. S., at 576. "The case teaches instead that the Establishment Clause must be interpreted 'by reference to historical practices and understandings'" and that the decision of the First Congress to "provid[e] for the appointment of chaplains only days after approving language for the First Amendment demonstrates that the Framers considered legislative prayer a benign acknowledgment of religion's role in society." *Ibid.*

The prevalence of this philosophy at the time of the founding is reflected in other prominent actions taken by the First Congress. It requested—and President Washington proclaimed—a national day of prayer, see 1 J. Richardson, Messages and Papers of the Presidents, 1789–1897, p. 64 (1897) (President Washington's Thanksgiving

Proclamation), and it reenacted the Northwest Territory Ordinance, which provided that "[r]eligion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged," 1 Stat. 52, n. (*a*). President Washington echoed this sentiment in his Farewell Address, calling religion and morality "indispensable supports" to "political prosperity." Farewell Address (1796), in 35 The Writings of George Washington 229 (J. Fitzpatrick ed. 1940). See also P. Hamburger, Separation of Church and State 66 (2002). The First Congress looked to these "supports" when it chose to begin its sessions with a prayer. This practice was designed to solemnize congressional meetings, unifying those in attendance as they pursued a common goal of good governance.

To achieve that purpose, legislative prayer needed to be inclusive rather than divisive, and that required a determined effort even in a society that was much more religiously homogeneous than ours today. Although the United States at the time was overwhelmingly Christian and Protestant,[28] there was considerable friction between Protestant denominations. See M. Noll, America's God: From Jonathan Edwards to Abraham Lincoln 228 (2002). Thus, when an Episcopal clergyman was nominated as chaplain, some Congregationalist Members of Congress objected due to the "'diversity of religious sentiments represented in Congress.'" D. Davis, Religion and the Continental Congress 74 (2000). Nevertheless, Samuel Adams, a staunch Congregationalist, spoke in favor of the motion: "'I am no bigot. I can hear a prayer from a man of piety and virtue, who is at the same time a friend of his country.'" *Ibid.* Others agreed and the chaplain was appointed.

Over time, the members of the clergy invited to offer

---

[28] W. Hutchison, Religious Pluralism in America 20–21 (2003).

prayers at the opening of a session grew more and more diverse. For example, an 1856 study of Senate and House Chaplains since 1789 tallied 22 Methodists, 20 Presbyterians, 19 Episcopalians, 13 Baptists, 4 Congregationalists, 2 Roman Catholics, and 3 that were characterized as "miscellaneous."[29] Four years later, Rabbi Morris Raphall became the first rabbi to open Congress.[30] Since then, Congress has welcomed guest chaplains from a variety of faiths, including Islam, Hinduism, Buddhism, and Native American religions.[31]

In *Town of Greece,* which concerned prayer before a town council meeting, there was disagreement about the inclusiveness of the town's practice. Compare 572 U. S., at 585 (opinion of the Court) ("The town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one"), with *id.*, at 616 (KAGAN, J., dissenting) ("Greece's Board did nothing to recognize religious diversity"). But there was no disagreement that the Establishment Clause permits a nondiscriminatory practice of prayer at the beginning of a town council session. See *ibid.* ("I believe that pluralism and inclusion [in legislative prayer] in a town hall can satisfy the constitutional requirement of neutrality"). Of course, the specific practice challenged in *Town of Greece* lacked the very direct connection, via the First Congress, to the thinking of those who were responsible for framing the First Amendment. But what mattered was that the town's practice "fi[t] within the tradition long followed in Congress and the state legislatures."

---

[29] A. Stokes, 3 Church and State in the United States 130 (1950).

[30] Korn, Rabbis, Prayers, and Legislatures, 23 Hebrew Union College Annual, No. 2, pp. 95, 96 (1950).

[31] See Lund, The Congressional Chaplaincies, 17 Wm. & Mary Bill of Rights J. 1171, 1204–1205 (2009). See also 160 Cong. Rec. 3853 (2014) (prayer by the Dalai Lama).

*Id.,* at 577 (opinion of the Court).

The practice begun by the First Congress stands out as an example of respect and tolerance for differing views, an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans. Where categories of monuments, symbols, and practices with a longstanding history follow in that tradition, they are likewise constitutional.

## III

Applying these principles, we conclude that the Bladensburg Cross does not violate the Establishment Clause.

As we have explained, the Bladensburg Cross carries special significance in commemorating World War I. Due in large part to the image of the simple wooden crosses that originally marked the graves of American soldiers killed in the war, the cross became a symbol of their sacrifice, and the design of the Bladensburg Cross must be understood in light of that background. That the cross originated as a Christian symbol and retains that meaning in many contexts does not change the fact that the symbol took on an added secular meaning when used in World War I memorials.

Not only did the Bladensburg Cross begin with this meaning, but with the passage of time, it has acquired historical importance. It reminds the people of Bladensburg and surrounding areas of the deeds of their predecessors and of the sacrifices they made in a war fought in the name of democracy. As long as it is retained in its original place and form, it speaks as well of the community that erected the monument nearly a century ago and has maintained it ever since. The memorial represents what the relatives, friends, and neighbors of the fallen soldiers felt at the time and how they chose to express their senti-

ments. And the monument has acquired additional layers of historical meaning in subsequent years. The Cross now stands among memorials to veterans of later wars. It has become part of the community.

The monument would not serve that role if its design had deliberately disrespected area soldiers who perished in World War I. More than 3,500 Jewish soldiers gave their lives for the United States in that conflict,[32] and some have wondered whether the names of any Jewish soldiers from the area were deliberately left off the list on the memorial or whether the names of any Jewish soldiers were included on the Cross against the wishes of their families. There is no evidence that either thing was done, and we do know that one of the local American Legion leaders responsible for the Cross's construction was a Jewish veteran. See App. 65, 205, 990.

The AHA's brief strains to connect the Bladensburg Cross and even the American Legion with anti-Semitism and the Ku Klux Klan, see Brief for Respondents 5–7, but the AHA's disparaging intimations have no evidentiary support. And when the events surrounding the erection of the Cross are viewed in historical context, a very different picture may perhaps be discerned. The monument was dedicated on July 12, 1925, during a period when the country was experiencing heightened racial and religious animosity. Membership in the Ku Klux Klan, which preached hatred of Blacks, Catholics, and Jews, was at its height.[33] On August 8, 1925, just two weeks after the dedication of the Bladensburg Cross and less than 10 miles away, some 30,000 robed Klansmen marched down Pennsylvania Avenue in the Nation's Capital. But the Bladensburg Cross memorial included the names of both

------

[32] J. Fredman & L. Falk, Jews in American Wars 100–101 (5th ed. 1954).

[33] Fryer & Levitt, Hatred and Profits: Under the Hood of the Ku Klux Klan, 127 Q. J. Econ. 1883 (2012).

Black and White soldiers who had given their lives in the war; and despite the fact that Catholics and Baptists at that time were not exactly in the habit of participating together in ecumenical services, the ceremony dedicating the Cross began with an invocation by a Catholic priest and ended with a benediction by a Baptist pastor. App. 1559–1569, 1373. We can never know for certain what was in the minds of those responsible for the memorial, but in light of what we know about this ceremony, we can perhaps make out a picture of a community that, at least for the moment, was united by grief and patriotism and rose above the divisions of the day.

Finally, it is surely relevant that the monument commemorates the death of particular individuals. It is natural and appropriate for those seeking to honor the deceased to invoke the symbols that signify what death meant for those who are memorialized. In some circumstances, the exclusion of any such recognition would make a memorial incomplete. This well explains why Holocaust memorials invariably include Stars of David or other symbols of Judaism.[34] It explains why a new memorial to Native American veterans in Washington, D. C., will portray a steel circle to represent "'the hole in the sky where the creator lives.'"[35] And this is why the memorial for soldiers from the Bladensburg community features the cross—the same symbol that marks the graves of so many of their comrades near the battlefields where they fell.

–––––––––––

[34] For example, the South Carolina Holocaust Memorial depicts a large Star of David "'in sacred memory of the six million,'" see https://www.onecolumbiasc.com/public-art/south-carolina-holocaust-memorial/, and the Philadelphia Monument to Six Million Jewish Martyrs depicts a burning bush, Torah scrolls, and a blazing menorah, see https://www.associationforpublicart.org/artwork/monument-to-six-million-jewish-martyrs/.

[35] Hedgpeth, "A Very Deep Kind of Patriotism": Memorial to Honor Native American Veterans Is Coming to the Mall, Washington Post, Mar. 31, 2019.

IV

The cross is undoubtedly a Christian symbol, but that fact should not blind us to everything else that the Bladensburg Cross has come to represent. For some, that monument is a symbolic resting place for ancestors who never returned home. For others, it is a place for the community to gather and honor all veterans and their sacrifices for our Nation. For others still, it is a historical landmark. For many of these people, destroying or defacing the Cross that has stood undisturbed for nearly a century would not be neutral and would not further the ideals of respect and tolerance embodied in the First Amendment. For all these reasons, the Cross does not offend the Constitution.

\*　　\*　　\*

We reverse the judgment of the Court of Appeals for the Fourth Circuit and remand the cases for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 17–1717 and 18–18

_____

THE AMERICAN LEGION, ET AL., PETITIONERS
17–1717              *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.; AND

MARYLAND-NATIONAL CAPITAL PARK AND
PLANNING COMMISSION, PETITIONER
18–18              *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 20, 2019]

JUSTICE BREYER, with whom JUSTICE KAGAN joins, concurring.

I have long maintained that there is no single formula for resolving Establishment Clause challenges. See *Van Orden* v. *Perry*, 545 U. S. 677, 698 (2005) (opinion concurring in judgment). The Court must instead consider each case in light of the basic purposes that the Religion Clauses were meant to serve: assuring religious liberty and tolerance for all, avoiding religiously based social conflict, and maintaining that separation of church and state that allows each to flourish in its "separate spher[e]." *Ibid.*; see also *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 717−723 (2002) (BREYER, J., dissenting).

I agree with the Court that allowing the State of Maryland to display and maintain the Peace Cross poses no threat to those ends. The Court's opinion eloquently explains why that is so: The Latin cross is uniquely associated with the fallen soldiers of World War I; the organiz-

ers of the Peace Cross acted with the undeniably secular motive of commemorating local soldiers; no evidence suggests that they sought to disparage or exclude any religious group; the secular values inscribed on the Cross and its place among other memorials strengthen its message of patriotism and commemoration; and, finally, the Cross has stood on the same land for 94 years, generating no controversy in the community until this lawsuit was filed. Nothing in the record suggests that the lack of public outcry "was due to a climate of intimidation." *Van Orden*, 545 U. S., at 702 (BREYER, J., concurring in judgment). In light of all these circumstances, the Peace Cross cannot reasonably be understood as "a government effort to favor a particular religious sect" or to "promote religion over nonreligion." *Ibid.* And, as the Court explains, ordering its removal or alteration at this late date would signal "a hostility toward religion that has no place in our Establishment Clause traditions." *Id.,* at 704.

The case would be different, in my view, if there were evidence that the organizers had "deliberately disrespected" members of minority faiths or if the Cross had been erected only recently, rather than in the aftermath of World War I. See *ante,* at 29; see also *Van Orden*, 545 U. S., at 703 (opinion of BREYER, J.) (explaining that, in light of the greater religious diversity today, "a more contemporary state effort" to put up a religious display is "likely to prove divisive in a way that [a] longstanding, pre-existing monument [would] not"). But those are not the circumstances presented to us here, and I see no reason to order *this* cross torn down simply because *other* crosses would raise constitutional concerns.

Nor do I understand the Court's opinion today to adopt a "history and tradition test" that would permit any newly constructed religious memorial on public land. See *post,* at 1, 4 (KAVANAUGH, J., concurring); cf. *post,* at 8–9 (GORSUCH, J., concurring in judgment). The Court appro-

priately "looks to history for guidance," *ante,* at 25 (plurality opinion), but it upholds the constitutionality of the Peace Cross only after considering its particular historical context and its long-held place in the community, see *ante,* at 28–30 (majority opinion).  A newer memorial, erected under different circumstances, would not necessarily be permissible under this approach.  Cf. *ante,* at 21.

As I have previously explained, "where the Establishment Clause is at issue," the Court must "'distinguish between real threat and mere shadow.'"  *Van Orden*, 545 U. S., at 704 (opinion concurring in judgment) (quoting *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 308 (1963) (Goldberg, J., concurring)).  In light of all the circumstances here, I agree with the Court that the Peace Cross poses no real threat to the values that the Establishment Clause serves.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 17–1717 and 18–18

_____

THE AMERICAN LEGION, ET AL., PETITIONERS
17–1717    *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.; AND

MARYLAND-NATIONAL CAPITAL PARK AND
PLANNING COMMISSION, PETITIONER
18–18    *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 20, 2019]

JUSTICE KAVANAUGH, concurring.

I join the Court's eloquent and persuasive opinion in full. I write separately to emphasize two points.

## I

Consistent with the Court's case law, the Court today applies a history and tradition test in examining and upholding the constitutionality of the Bladensburg Cross. See *Marsh* v. *Chambers*, 463 U. S. 783, 787–792, 795 (1983); *Van Orden* v. *Perry*, 545 U. S. 677, 686–690 (2005) (plurality opinion); *Town of Greece* v. *Galloway*, 572 U. S. 565, 575–578 (2014).

As this case again demonstrates, this Court no longer applies the old test articulated in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971). The *Lemon* test examined, among other things, whether the challenged government action had a primary effect of advancing or endorsing religion. If *Lemon* guided this Court's understanding of the Establishment Clause, then many of the Court's Establishment

Clause cases over the last 48 years would have been decided differently, as I will explain.

The opinion identifies five relevant categories of Establishment Clause cases: (1) religious symbols on government property and religious speech at government events; (2) religious accommodations and exemptions from generally applicable laws; (3) government benefits and tax exemptions for religious organizations; (4) religious expression in public schools; and (5) regulation of private religious speech in public forums. See *ante*, at 15, n. 16.

The *Lemon* test does not explain the Court's decisions in any of those five categories.

In the first category of cases, the Court has relied on history and tradition and upheld various religious symbols on government property and religious speech at government events. See, *e.g.*, *Marsh*, 463 U. S., at 787–792, 795; *Van Orden*, 545 U. S., at 686–690 (plurality opinion); *Town of Greece*, 572 U. S., at 575–578. The Court does so again today. *Lemon* does not account for the results in these cases.

In the second category of cases, this Court has allowed legislative accommodations for religious activity and upheld legislatively granted religious exemptions from generally applicable laws. See, *e.g.*, *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327 (1987); *Cutter* v. *Wilkinson*, 544 U. S. 709 (2005). But accommodations and exemptions "by definition" have the effect of advancing or endorsing religion to some extent. *Amos*, 483 U. S., at 347 (O'Connor, J., concurring in judgment) (quotation altered). *Lemon*, fairly applied, does not justify those decisions.

In the third category of cases, the Court likewise has upheld government benefits and tax exemptions that go to religious organizations, even though those policies have the effect of advancing or endorsing religion. See, *e.g.*, *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664

(1970); *Mueller* v. *Allen*, 463 U. S. 388 (1983); *Mitchell* v. *Helms*, 530 U. S. 793 (2000) (plurality opinion); *Zelman* v. *Simmons-Harris*, 536 U. S. 639 (2002); *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. \_\_\_ (2017). Those outcomes are not easily reconciled with *Lemon*.

In the fourth category of cases, the Court has proscribed government-sponsored prayer in public schools. The Court has done so not because of *Lemon*, but because the Court concluded that government-sponsored prayer in public schools posed a risk of coercion of students. The Court's most prominent modern case on that subject, *Lee* v. *Weisman*, 505 U. S. 577 (1992), did not rely on *Lemon*. In short, *Lemon* was not necessary to the Court's decisions holding government-sponsored school prayers unconstitutional.

In the fifth category, the Court has allowed private religious speech in public forums on an equal basis with secular speech. See, *e.g.*, *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993); *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753 (1995); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995); *Good News Club* v. *Milford Central School*, 533 U. S. 98 (2001). That practice does not violate the Establishment Clause, the Court has ruled. *Lemon* does not explain those cases.

Today, the Court declines to apply *Lemon* in a case in the religious symbols and religious speech category, just as the Court declined to apply *Lemon* in *Town of Greece* v. *Galloway*, *Van Orden* v. *Perry*, and *Marsh* v. *Chambers*. The Court's decision in this case again makes clear that the *Lemon* test does not apply to Establishment Clause cases in that category. And the Court's decisions over the span of several decades demonstrate that the *Lemon* test is not good law and does not apply to Establishment Clause cases in any of the five categories.

On the contrary, each category of Establishment Clause

cases has its own principles based on history, tradition, and precedent. And the cases together lead to an over-arching set of principles: If the challenged government practice is not coercive *and* if it (i) is rooted in history and tradition; or (ii) treats religious people, organizations, speech, or activity equally to comparable secular people, organizations, speech, or activity; or (iii) represents a permissible legislative accommodation or exemption from a generally applicable law, then there ordinarily is no Establishment Clause violation.*

The practice of displaying religious memorials, particu-larly religious war memorials, on public land is not coer-cive and is rooted in history and tradition. The Bladens-burg Cross does not violate the Establishment Clause. Cf. *Town of Greece*, 572 U. S. 565.

## II

The Bladensburg Cross commemorates soldiers who gave their lives for America in World War I. I agree with the Court that the Bladensburg Cross is constitutional. At the same time, I have deep respect for the plaintiffs' sin-cere objections to seeing the cross on public land. I have great respect for the Jewish war veterans who in an *ami-cus* brief say that the cross on public land sends a message of exclusion. I recognize their sense of distress and aliena-tion. Moreover, I fully understand the deeply religious nature of the cross. It would demean both believers and nonbelievers to say that the cross is not religious, or not all that religious. A case like this is difficult because it represents a clash of genuine and important interests. Applying our precedents, we uphold the constitutionality of the cross. In doing so, it is appropriate to also restate this bedrock constitutional principle: All citizens are

———————
*That is not to say that challenged government actions outside that safe harbor are unconstitutional. Any such cases must be analyzed under the relevant Establishment Clause principles and precedents.

equally American, no matter what religion they are, or if they have no religion at all.

The conclusion that the cross does not violate the Establishment Clause does not necessarily mean that those who object to it have no other recourse. The Court's ruling *allows* the State to maintain the cross on public land. The Court's ruling does not *require* the State to maintain the cross on public land. The Maryland Legislature could enact new laws requiring removal of the cross or transfer of the land. The Maryland Governor or other state or local executive officers may have authority to do so under current Maryland law. And if not, the legislature could enact new laws to authorize such executive action. The Maryland Constitution, as interpreted by the Maryland Court of Appeals, may speak to this question. And if not, the people of Maryland can amend the State Constitution.

Those alternative avenues of relief illustrate a fundamental feature of our constitutional structure: This Court is not the *only* guardian of individual rights in America. This Court fiercely protects the individual rights secured by the U. S. Constitution. See, *e.g.*, *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943); *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972). But the Constitution sets a floor for the protection of individual rights. The constitutional floor is sturdy and often high, but it is a floor. Other federal, state, and local government entities generally possess authority to safeguard individual rights above and beyond the rights secured by the U. S. Constitution. See generally J. Sutton, 51 Imperfect Solutions (2018); Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977).

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 17–1717 and 18–18

_____

THE AMERICAN LEGION, ET AL., PETITIONERS
17–1717               *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.; AND

MARYLAND-NATIONAL CAPITAL PARK AND
PLANNING COMMISSION, PETITIONER
18–18               *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 20, 2019]

JUSTICE KAGAN, concurring in part.

I fully agree with the Court's reasons for allowing the Bladensburg Peace Cross to remain as it is, and so join Parts I, II–B, II–C, III, and IV of its opinion, as well as JUSTICE BREYER's concurrence. Although I agree that rigid application of the *Lemon* test does not solve every Establishment Clause problem, I think that test's focus on purposes and effects is crucial in evaluating government action in this sphere—as this very suit shows. I therefore do not join Part II–A. I do not join Part II–D out of perhaps an excess of caution. Although I too "look[] to history for guidance," *ante,* at 25 (plurality opinion), I prefer at least for now to do so case-by-case, rather than to sign on to any broader statements about history's role in Establishment Clause analysis. But I find much to admire in this section of the opinion—particularly, its emphasis on whether longstanding monuments, symbols, and practices reflect "respect and tolerance for differing views, an honest

endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans." *Ante,* at 28. Here, as elsewhere, the opinion shows sensitivity to and respect for this Nation's pluralism, and the values of neutrality and inclusion that the First Amendment demands.

# SUPREME COURT OF THE UNITED STATES
_____

Nos. 17–1717 and 18–18
_____

THE AMERICAN LEGION, ET AL., PETITIONERS
17–1717                    *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.; AND


MARYLAND-NATIONAL CAPITAL PARK AND
PLANNING COMMISSION, PETITIONER
18–18                    *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 20, 2019]

JUSTICE THOMAS, concurring in the judgment.

The Establishment Clause states that "Congress shall make no law respecting an establishment of religion." U. S. Const., Amdt. 1. The text and history of this Clause suggest that it should not be incorporated against the States. Even if the Clause expresses an individual right enforceable against the States, it is limited by its text to "law[s]" enacted by a legislature, so it is unclear whether the Bladensburg Cross would implicate any incorporated right. And even if it did, this religious display does not involve the type of actual legal coercion that was a hallmark of historical establishments of religion. Therefore, the Cross is clearly constitutional.

I

As I have explained elsewhere, the Establishment Clause resists incorporation against the States. *Town of Greece* v. *Galloway*, 572 U. S. 565, 604–607 (2014) (opinion concurring in part and concurring in judgment); *Elk Grove*

*Unified School Dist.* v. *Newdow*, 542 U. S. 1, 49–51 (2004) (opinion concurring in judgment); *Van Orden* v. *Perry*, 545 U. S. 677, 692–693 (2005) (concurring opinion); *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 677–680 (2002) (same). In *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 15 (1947), the Court "casually" incorporated the Clause with a declaration that because the Free Exercise Clause had been incorporated, "'[t]here is every reason to give the same application and broad interpretation to the "establishment of religion" clause.'" *Town of Greece*, 572 U. S*.,* at 607, n. 1 (opinion of THOMAS, J.). The Court apparently did not consider that an incorporated Establishment Clause would prohibit exactly what the text of the Clause seeks to protect: state establishments of religion. See *id.,* at 605–606.

The Court's "inattention" to the significant question of incorporation "might be explained, although not excused, by the rise of popular conceptions about 'separation of church and state' as an 'American' constitutional right." *Id.,* at 608, n. 1; see P. Hamburger, Separation of Church and State 454–463 (2002); see also *id.*, at 391–454 (tracing the role of nativist sentiment in the rise of "the modern myth of separation" as an American ideal). But an ahistorical generalization is no substitute for careful constitutional analysis. We should consider whether any longstanding right of citizenship restrains the States in the establishment context. See generally *McDonald* v. *Chicago,* 561 U. S. 742, 805–858, and n. 20 (2010) (THOMAS, J., concurring in part and concurring in judgment).

Further confounding the incorporation question is the fact that the First Amendment by its terms applies only to "law[s]" enacted by "Congress." Obviously, a memorial is not a law. And respondents have not identified any specific law they challenge as unconstitutional, either on its face or as applied. Thus, respondents could prevail on their

establishment claim only if the prohibition embodied in the Establishment Clause was understood to be an individual right of citizenship that applied to more than just "law[s]" "ma[de]" by "Congress."[1]

## II

Even if the Clause applied to state and local governments in some fashion, "[t]he mere presence of the monument along [respondents'] path involves no coercion and thus does not violate the Establishment Clause." *Van Orden*, 545 U. S., at 694 (opinion of THOMAS, J.). The *sine qua non* of an establishment of religion is "'actual legal coercion.'" *Id.,* at 693. At the founding, "[t]he coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support by force of law and threat of penalty." *Lee* v. *Weisman*, 505 U. S. 577, 640 (1992) (Scalia, J., dissenting) (emphasis deleted). "In a typical case, attendance at the established church was mandatory, and taxes were levied to generate church revenue. Dissenting ministers were barred from preaching, and political participation was limited to members of the established church." *Town of Greece*, *supra*, at 608 (opinion of THOMAS, J.) (citation omitted). In an action claiming an unconstitutional establishment of religion, the plaintiff must demonstrate that he was actually coerced by government conduct that shares the characteristics of an establishment as understood at the founding.[2]

———————

[1] In my view, the original meaning of the phrase "Congress shall make no law" is a question worth exploring. Compare G. Lawson & G. Seidman, The Constitution of Empire 42 (2004) (arguing that the First Amendment "applies only to Congress"), with *Shrum* v. *Coweta*, 449 F. 3d 1132, 1140–1143 (CA10 2006) (McConnell, J.) (arguing that it is not so limited).

[2] Of course, cases involving state or local action are not strictly speaking Establishment Clause cases, but instead Fourteenth Amendment cases about a privilege or immunity of citizenship. It is conceivable

Here, respondents briefly suggest that the government's spending their tax dollars on maintaining the Bladensburg Cross represents coercion, but they have not demonstrated that maintaining a religious display on public property shares any of the historical characteristics of an establishment of religion. The local commission has not attempted to control religious doctrine or personnel, compel religious observance, single out a particular religious denomination for exclusive state subsidization, or punish dissenting worship. Instead, the commission has done something that the founding generation, as well as the generation that ratified the Fourteenth Amendment, would have found commonplace: displaying a religious symbol on government property. See Brief for Becket Fund for Religious Liberty as *Amicus Curiae* 14–22. Lacking any characteristics of "the coercive state establishments that existed at the founding," *Town of Greece*, 572 U. S., at 608 (opinion of THOMAS, J.), the Bladensburg Cross is constitutional.

The Bladensburg Cross is constitutional even though the cross has religious significance as a central symbol of Christianity. Respondents' primary contention is that this characteristic of the Cross makes it "sectarian"—a word used in respondents' brief more than 40 times. Putting aside the fact that Christianity is not a "sect," religious displays or speech need not be limited to that which a "judge considers to be nonsectarian." *Id.*, at 582 (majority opinion). As the Court has explained, "[a]n insistence on nonsectarian" religious speech is inconsistent with our Nation's history and traditions. *Id.,* at 578–580; see *id.,* at 595 (ALITO, J., concurring). Moreover, requiring that

_____

that the salient characteristics of an establishment changed by the time of the Fourteenth Amendment, see *Town of Greece* v. *Galloway*, 572 U. S. 565, 607, 609–610 (2014) (THOMAS, J., concurring in part and concurring in judgment), but respondents have presented no evidence suggesting so.

religious expressions be nonsectarian would force the
courts "to act as supervisors and censors of religious
speech." *Id.,* at 581 (majority opinion). Any such effort
would find courts "trolling through . . . religious beliefs" to
decide what speech is sufficiently generic. *Mitchell* v.
*Helms*, 530 U. S. 793, 828 (2000) (plurality opinion). And
government bodies trying to comply with the inevitably
arbitrary decisions of the courts would face similarly
intractable questions. See *Town of Greece, supra,* at 596
(opinion of ALITO, J.).[3]

_____

[3]Another reason to avoid a constitutional test that turns on the "sectarian" nature of religious speech is that the Court has suggested "formally dispens[ing]" with this factor in related contexts. *Mitchell*, 530 U. S., at 826 (plurality opinion). Among other reasons, the "sectarian" test "has a shameful pedigree" that originated during the 1870s when Congress considered the Blaine Amendment, "which would have amended the Constitution to bar any aid to sectarian institutions." *Id.,* at 828. "Consideration of the amendment arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that 'sectarian' was code for 'Catholic.'" *Ibid.* This anti-Catholic hostility may well have played a role in the Court's later decisions. *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1 (1947), for example, was written by Justice Black, who would later accuse Catholics who advocated for textbook loans to religious schools of being "powerful sectarian religious propagandists . . . looking toward complete domination and supremacy of their particular brand of religion." *Board of Ed. of Central School Dist. No. 1* v. *Allen*, 392 U. S. 236, 251 (1968) (Black, J., dissenting). Even by the time of *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), some Justices were still "influenced by residual anti-Catholicism and by a deep suspicion of Catholic schools." Laycock, The Underlying Unity of Separation and Neutrality, 46 Emory L. J. 43, 58 (1997). Indeed, the Court's opinion in *Lemon* "relied on what it considered to be inherent risks in religious schools despite the absence of a record in *Lemon* itself and despite contrary fact-finding by the district court in the companion case." Laycock, *supra,* at 58 (footnote omitted); see generally W. Ball, Mere Creatures of the State?, 35–40 (1994). And in his concurring opinion, Justice Douglas (joined by Justice Black) repeatedly quoted an anti-Catholic book, including for the proposition that, in Catholic parochial schools, "'[t]he whole education of the child is filled with propaganda.'" 403 U. S., at 635, n. 20

### III

As to the long-discredited test set forth in *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971), and reiterated in *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 592–594 (1989), the plurality rightly rejects its relevance to claims, like this one, involving "religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies." *Ante,* at 15–16, and n. 16. I agree with that aspect of its opinion. I would take the logical next step and overrule the *Lemon* test in all contexts. First, that test has no basis in the original meaning of the Constitution. Second, "since its inception," it has "been manipulated to fit whatever result the Court aimed to achieve." *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844, 900 (2005) (Scalia, J., dissenting); see *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 398–399 (1993) (Scalia, J., concurring in judgment). Third, it continues to cause enormous confusion in the States and the lower courts. See generally *Utah Highway Patrol Assn.* v. *American Atheists, Inc.*, 565 U. S. 994 (2011) (THOMAS, J., dissenting from denial of certiorari). In recent decades, the Court has tellingly refused to apply *Lemon* in the very cases where it purports to be most useful. See *Utah Highway*, *supra*, at 997–998 (collecting cases); *ante,* at 13 (plurality opinion) (same). The obvious explanation is that *Lemon* does not provide a sound basis for judging Establishment Clause claims.

---

(quoting L. Boettner, Roman Catholicism 360 (1962)); see 403 U. S., at 636 (similar). The tract said that Hitler, Mussolini, and Stalin learned the "secret[s] of [their] success" in indoctrination from the Catholic Church, and that "an undue proportion of the gangsters, racketeers, thieves, and juvenile delinquents who roam our big city streets come . . . from the [Catholic] parochial schools," where children are taught by "brain-washed," "'ignorant European peasants.'" Boettner, *supra,* at 363, 370–372.

However, the court below "s[aw] fit to apply *Lemon.*" 874 F. 3d 195, 205 (CA4 2017). It is our job to say what the law is, and because the *Lemon* test is not good law, we ought to say so.

*          *          *

Regrettably, I cannot join the Court's opinion because it does not adequately clarify the appropriate standard for Establishment Clause cases. Therefore, I concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 17–1717 and 18–18

_____

THE AMERICAN LEGION, ET AL., PETITIONERS
17–1717               *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.; AND


MARYLAND-NATIONAL CAPITAL PARK AND
PLANNING COMMISSION, PETITIONER
18–18               *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 20, 2019]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring in the judgment.

The American Humanist Association wants a federal court to order the destruction of a 94 year-old war memorial because its members are offended. Today, the Court explains that the plaintiffs are not entitled to demand the destruction of longstanding monuments, and I find much of its opinion compelling. In my judgment, however, it follows from the Court's analysis that suits like this one should be dismissed for lack of standing. Accordingly, while I concur in the judgment to reverse and remand the court of appeals' decision, I would do so with additional instructions to dismiss the case.

*

The Association claims that its members "regularly" come into "unwelcome direct contact" with a World War I memorial cross in Bladensburg, Maryland "while driving in the area." 874 F. 3d 195, 203 (CA4 2017). And this, the

Association suggests, is enough to allow it to insist on a federal judicial decree ordering the memorial's removal. Maybe, the Association concedes, others who are less offended lack standing to sue. Maybe others still who are equally affected but who come into contact with the memorial too infrequently lack standing as well. See Tr. of Oral Arg. 48–49. But, the Association assures us, its members are offended enough—and with sufficient frequency—that they may sue.

This "offended observer" theory of standing has no basis in law. Federal courts may decide only those cases and controversies that the Constitution and Congress have authorized them to hear. And to establish standing to sue consistent with the Constitution, a plaintiff must show: (1) injury-in-fact, (2) causation, and (3) redressability. The injury-in-fact test requires a plaintiff to prove "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992) (internal quotation marks omitted).

Unsurprisingly, this Court has already rejected the notion that offense alone qualifies as a "concrete and particularized" injury sufficient to confer standing. We could hardly have been clearer: "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Diamond* v. *Charles*, 476 U. S. 54, 62 (1986). Imagine if a bystander disturbed by a police stop tried to sue under the Fourth Amendment. Suppose an advocacy organization whose members were distressed by a State's decision to deny someone else a civil jury trial sought to complain under the Seventh Amendment. Or envision a religious group upset about the application of the death penalty trying to sue to stop it. Does anyone doubt those cases would be rapidly dispatched for lack of standing? Cf. *Whitmore* v. *Arkansas,* 495 U. S. 149, 151 (1990) (holding

that a third party does not have "standing to challenge the validity of a death sentence imposed on a capital defendant who has elected to forgo his right of appeal").

It's not hard to see why this Court has refused suits like these. If individuals and groups could invoke the authority of a federal court to forbid what they dislike for no more reason than they dislike it, we would risk exceeding the judiciary's limited constitutional mandate and infringing on powers committed to other branches of government. Courts would start to look more like legislatures, responding to social pressures rather than remedying concrete harms, in the process supplanting the right of the people and their elected representatives to govern themselves. See, *e.g.*, *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 408 (2013) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches"); *Warth* v. *Seldin*, 422 U. S. 490, 500 (1975) (without standing requirements "courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions"); *Hein* v. *Freedom From Religion Foundation, Inc.*, 551 U. S. 587, 635–636 (2007) (Scalia, J., concurring in judgment) ("'To permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing "government by injunction"'").

Proceeding on these principles, this Court has held offense alone insufficient to convey standing in analogous—and arguably more sympathetic—circumstances. Take *Allen* v. *Wright*, 468 U. S. 737 (1984), where the parents of African-American schoolchildren sued to compel

the Internal Revenue Service to deny tax-exempt status to schools that discriminated on the basis of race. The parents claimed that their children suffered a "stigmatic injury, or denigration" when the government supported racially discriminatory institutions. *Id.*, at 754. But this Court refused to entertain the case, reasoning that standing extends "only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Id.*, at 755 (internal quotation marks omitted). Now put the teachings there alongside the Association's standing theory here and you get this utterly unjustifiable result: An African-American offended by a Confederate flag atop a state capitol would lack standing to sue under the Equal Protection Clause, but an atheist who is offended by the cross on the same flag could sue under the Establishment Clause. Who really thinks *that* could be the law? See Brief for Becket Fund for Religious Liberty as *Amicus Curiae* 34–35.

Consider, as well, the Free Exercise Clause. In *Harris* v. *McRae*, 448 U. S. 297 (1980), this Court denied standing to a religious group that raised a free exercise challenge to federal restrictions on abortion funding because "the plaintiffs had 'not contended that the [statute in question] in any way coerce[d] them *as individuals* in the practice of their religion.'" *Id.*, at 321, n. 24. Instead, the Court has held, a free exercise plaintiff generally must "show that his good-faith religious beliefs are hampered before he acquires standing to attack a statute under the Free-Exercise Clause." *Braunfeld* v. *Brown*, 366 U. S. 599, 615 (1961) (Brennan, J., concurring and dissenting). And if standing doctrine has such bite under the Free Exercise Clause, it's difficult to see how it could be as toothless as plaintiffs suppose under the neighboring Establishment Clause.

In fact, this Court has already expressly rejected "offended observer" standing under the Establishment

Clause itself. In *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464 (1982), the plaintiffs objected to a transfer of property from the federal government to a religious college, an action they had learned about through a news release. This Court had little trouble concluding that the plaintiffs lacked standing to challenge the transfer, explaining that "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not an injury-in-fact "sufficient to confer standing under Art. III." *Id.*, at 485. To be sure, this Court has sometimes resolved Establishment Clause challenges to religious displays on the merits without first addressing standing. But as this Court has held, its own failure to consider standing cannot be mistaken as an endorsement of it: "[D]rive-by jurisdictional rulings of this sort" carry "no precedential effect." *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 91 (1998).

Offended observer standing is deeply inconsistent, too, with many other longstanding principles and precedents. For example, this Court has consistently ruled that "'generalized grievances' about the conduct of Government" are insufficient to confer standing to sue. *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 217 (1974). But if offended observers could bring suit, this rule would be rendered meaningless: Who, after all, would have trouble recasting a generalized grievance about governmental action into an "I-take-offense" argument for standing? Similarly, this Court has long "adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Kowalski* v. *Tesmer*, 543 U. S. 125, 129 (2004). We depart from this rule only where the party seeking to invoke the judicial power "has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the

possessor's ability to protect his own interests." *Id.*, at 130. Applying these principles in *Kowalski*, this Court held that attorneys lacked standing to assert the rights of indigent defendants. *Id.*, at 127. And in *Whitmore*, we rejected a third party's effort to appeal another person's death sentence. 495 U. S., at 151. But if offended observers could sue, the attorneys in *Kowalski* might have simply claimed they were "offended" by Michigan's procedure for appointing appellate counsel, and the third party in *Whitmore* could have just said he was offended (as he surely was) by the impending execution. None of this Court's limits on third-party standing would really matter.

*

Offended observer standing cannot be squared with this Court's longstanding teachings about the limits of Article III. Not even today's dissent seriously attempts to defend it. So at this point you might wonder: How *did* the lower courts in this case indulge the plaintiffs' "offended observer" theory of standing? And why have other lower courts done similarly in other cases?

The truth is, the fault lies here. Lower courts invented offended observer standing for Establishment Clause cases in the 1970s in response to this Court's decision in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971). *Lemon* held that whether governmental action violates the Establishment Clause depends on its (1) purpose, (2) effect, and (3) potential to "'excessive[ly] . . . entangl[e]'" church and state, *id.*, at 613, a standard this Court came to understand as prohibiting the government from doing anything that a "'reasonable observer'" might perceive as "endorsing" religion, *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 620–621 (1989) (opinion of Blackmun, J.); *id.*, at 631 (O'Connor, J., concurring in part and concurring in judgment). And lower courts reasoned that, if the Establish-

ment Clause forbids anything a reasonable observer would view as an endorsement of religion, then such an observer must be able to sue. *Moore* v. *Bryant*, 853 F. 3d 245, 250 (CA5 2017). Here alone, lower courts concluded, though never with this Court's approval, an observer's offense must "suffice to make an Establishment Clause claim justiciable." *Suhre* v. *Haywood Cty.*, 131 F. 3d 1083, 1086 (CA4 1997).

As today's plurality rightly indicates in Part II–A, however, *Lemon* was a misadventure. It sought a "grand unified theory" of the Establishment Clause but left us only a mess. See *ante*, at 24 (plurality opinion). How much "purpose" to promote religion is too much (are Sunday closing laws that bear multiple purposes, religious and secular, problematic)? How much "effect" of advancing religion is tolerable (are even incidental effects disallowed)? What does the "entanglement" test add to these inquiries? Even beyond all that, how "reasonable" must our "reasonable observer" be, and what exactly qualifies as impermissible "endorsement" of religion in a country where "In God We Trust" appears on the coinage, the eye of God appears in its Great Seal, and we celebrate Thanksgiving as a national holiday ("to Whom are thanks being given")? *Harris* v. *Zion*, 927 F. 2d 1401, 1423 (CA7 1991) (Easterbrook, J., dissenting). Nearly half a century after *Lemon* and, the truth is, no one has any idea about the answers to these questions. As the plurality documents, our "doctrine [is] in such chaos" that lower courts have been "free to reach almost any result in almost any case." McConnell, Religious Participation in Public Programs: Religious Freedom at a Crossroads, 59 U. Chi. L. Rev. 115, 119 (1992). Scores of judges have pleaded with us to retire *Lemon*, scholars of all stripes have criticized the doctrine, and a majority of this Court has long done the same. *Ante*, at 14–15 (plurality opinion). Today, not a single Member of the Court even tries to defend

*Lemon* against these criticisms—and they don't because they can't.  As Justice Kennedy explained, *Lemon* is "flawed in its fundamentals," has proved "unworkable in practice," and is "inconsistent with our history and our precedents."  *County of Allegheny*, 492 U. S., at 655, 669 (opinion concurring in judgment in part and dissenting in part).

In place of *Lemon*, Part II–D of the plurality opinion relies on a more modest, historically sensitive approach, recognizing that "the Establishment Clause must be interpreted by reference to historical practices and understandings."  *Ante*, at 25 (quoting *Town of Greece* v. *Galloway*, 572 U. S. 565, 576 (2014) (internal quotation marks omitted); see also *ante*, at 1–4 (KAVANAUGH, J., concurring).  So, by way of example, the plurality explains that a state legislature may permissibly begin each session with a prayer by an official chaplain because "Congress for more than 200 years had opened its sessions with a prayer and . . . many state legislatures had followed suit."  *Ante*, at 25 (discussing *Marsh* v. *Chambers*, 463 U. S. 783 (1983), and *Town of Greece*, 572 U. S. 565).  The constitutionality of a practice doesn't depend on some artificial and indeterminate three-part test; what matters, the plurality reminds us, is whether the challenged practice fits "'within the tradition'" of this country.  *Ante*, at 27 (citing *Town of Greece*, 572 U. S., at 577).

I agree with all this and don't doubt that the monument before us is constitutional in light of the nation's traditions.  But then the plurality continues on to suggest that "longstanding monuments, symbols, and practices" are "presumpt[ively]" constitutional.  *Ante*, at 16.  And about that, it's hard not to wonder: How old must a monument, symbol, or practice be to qualify for this new presumption?  It seems 94 years is enough, but what about the Star of David monument erected in South Carolina in 2001 to commemorate victims of the Holocaust, or the cross that

marines in California placed in 2004 to honor their comrades who fell during the War on Terror? And where exactly in the Constitution does this presumption come from? The plurality does not say, nor does it even explain what work its presumption does. To the contrary, the plurality proceeds to analyze the "presumptively" constitutional memorial in this case for its consistency with "'historical practices and understandings'" under *Marsh* and *Town of Greece*—exactly the same approach that the plurality, quoting *Town of Greece*, recognizes "'must be'" used *whenever* we interpret the Establishment Clause. *Ante*, at 25; see also *ante*, at 2–4 (KAVANAUGH, J., concurring). Though the plurality does not say so in as many words, the message for our lower court colleagues seems unmistakable: Whether a monument, symbol, or practice is old or new, apply *Town of Greece*, not *Lemon*. Indeed, some of our colleagues recognize this implication and blanch at its prospect. See *ante*, at 2–3 (BREYER, J., concurring); *ante*, at 1–2 (KAGAN, J., concurring in part) (declining to join Parts II–A & II–D); *post*, at 2, n. 2 (GINSBURG, J., dissenting). But if that's the real message of the plurality's opinion, it seems to me exactly right— because what matters when it comes to assessing a monument, symbol, or practice isn't its age but its compliance with ageless principles. The Constitution's meaning is fixed, not some good-for-this-day-only coupon, and a practice consistent with our nation's traditions is just as permissible whether undertaken today or 94 years ago.

\*

With *Lemon* now shelved, little excuse will remain for the anomaly of offended observer standing, and the gaping hole it tore in standing doctrine in the courts of appeals should now begin to close. Nor does this development mean colorable Establishment Clause violations will lack for proper plaintiffs. By way of example only, a public

school student compelled to recite a prayer will still have standing to sue. See *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 224, n. 9 (1963). So will persons denied public office because of their religious affiliations or lack of them. And so will those who are denied government benefits because they do not practice a favored religion or any at all. *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1, 7–8 (1989) (plurality opinion). On top of all that, States remain free to supply other forms of relief consistent with their own laws and constitutions.

Abandoning offended observer standing will mean only a return to the usual demands of Article III, requiring a real controversy with real impact on real persons to make a federal case out of it. Along the way, this will bring with it the welcome side effect of rescuing the federal judiciary from the sordid business of having to pass aesthetic judgment, one by one, on every public display in this country for its perceived capacity to give offense. It's a business that has consumed volumes of the federal reports, invited erratic results, frustrated generations of judges, and fomented "the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid." *Van Orden* v. *Perry*, 545 U. S. 677, 704 (2005) (BREYER, J., concurring in judgment). Courts applying *Lemon*'s test have upheld Ten Commandment displays and demanded their removal; they have allowed memorial crosses and insisted that they be razed; they have permitted Christmas displays and pulled the plug on them; and they have pondered seemingly endlessly the inclusion of "In God We Trust" on currency or similar language in our Pledge of Allegiance. No one can predict the rulings—but one thing is certain: Between the challenged practices and the judicial decisions, just about everyone will wind up offended.

Nor have we yet come close to exhausting the potential sources of offense and federal litigation *Lemon* invited, for what about the display of the Ten Commandments on the

frieze in our own courtroom or on the doors leading into it? Or the statues of Moses and the Apostle Paul next door in the Library of Congress? Or the depictions of the Ten Commandments found in the Justice Department and the National Archives? Or the crosses that can be found in the U. S. Capitol building? And all that just takes us mere steps from where we sit. In light of today's decision, we should be done with this business, and our lower court colleagues may dispose of cases like these on a motion to dismiss rather than enmeshing themselves for years in intractable disputes sure to generate more heat than light.

\*

In a large and diverse country, offense can be easily found. Really, most every governmental action probably offends *somebody*. No doubt, too, that offense can be sincere, sometimes well taken, even wise. But recourse for disagreement and offense does not lie in federal litigation. Instead, in a society that holds among its most cherished ambitions mutual respect, tolerance, self-rule, and democratic responsibility, an "offended viewer" may "avert his eyes," *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 212 (1975), or pursue a political solution. Today's decision represents a welcome step toward restoring this Court's recognition of these truths, and I respectfully concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 17–1717 and 18–18

---

THE AMERICAN LEGION, ET AL., PETITIONERS
17–1717             *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.; AND

MARYLAND-NATIONAL CAPITAL PARK AND
PLANNING COMMISSION, PETITIONER
18–18             *v.*
AMERICAN HUMANIST ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 20, 2019]

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR joins, dissenting.

An immense Latin cross stands on a traffic island at the center of a busy three-way intersection in Bladensburg, Maryland.[1] "[M]onumental, clear, and bold" by day, App. 914, the cross looms even larger illuminated against the night-time sky. Known as the Peace Cross, the monument was erected by private citizens in 1925 to honor local soldiers who lost their lives in World War I. "[T]he town's most prominent symbol" was rededicated in 1985 and is now said to honor "the sacrifices made [in] all wars," *id.,* at 868 (internal quotation marks omitted), by "all veterans," *id.,* at 195. Both the Peace Cross and the traffic island are owned and maintained by the Maryland-National Capital Park and Planning Commission (Commission), an agency of the State of Maryland.

---

[1] A photograph of the monument and a map showing its location are reproduced in the Appendix, *infra*, at 19.

Decades ago, this Court recognized that the Establishment Clause of the First Amendment to the Constitution demands governmental neutrality among religious faiths, and between religion and nonreligion. See *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 15 (1947). Numerous times since, the Court has reaffirmed the Constitution's commitment to neutrality. Today the Court erodes that neutrality commitment, diminishing precedent designed to preserve individual liberty and civic harmony in favor of a "presumption of constitutionality for longstanding monuments, symbols, and practices." *Ante,* at 16 (plurality opinion).[2]

The Latin cross is the foremost symbol of the Christian faith, embodying the "central theological claim of Christianity: that the son of God died on the cross, that he rose from the dead, and that his death and resurrection offer the possibility of eternal life." Brief for Baptist Joint Committee for Religious Liberty et al. as *Amici Curiae* 7 (Brief for *Amici* Christian and Jewish Organizations). Precisely because the cross symbolizes these sectarian beliefs, it is a common marker for the graves of Christian soldiers. For the same reason, using the cross as a war memorial does not transform it into a secular symbol, as the Courts of Appeals have uniformly recognized. See

———————

[2]Some of my colleagues suggest that the Court's new presumption extends to all governmental displays and practices, regardless of their age. See *ante,* at 3 (KAVANAUGH, J., concurring); *ante,* at 6 (THOMAS, J., concurring in judgment); *ante,* at 9 (GORSUCH, J., concurring in judgment). But see *ante,* at 2 (BREYER, J., joined by KAGAN, J., concurring) ("'[A] more contemporary state effort' to put up a religious display is 'likely to prove divisive in a way that [a] longstanding, pre-existing monument [would] not.'"). I read the Court's opinion to mean what it says: "[R]etaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones," *ante,* at 21, and, consequently, only "longstanding monuments, symbols, and practices" enjoy "a presumption of constitutionality," *id.,* at 16 (plurality opinion).

*infra*, at 10–11, n. 10.  Just as a Star of David is not suitable to honor Christians who died serving their country, so a cross is not suitable to honor those of other faiths who died defending their nation.  Soldiers of all faiths "are united by their love of country, but they are not united by the cross."  Brief for Jewish War Veterans of the United States of America, Inc., as *Amicus Curiae* 3 (Brief for *Amicus* Jewish War Veterans).

By maintaining the Peace Cross on a public highway, the Commission elevates Christianity over other faiths, and religion over nonreligion.  Memorializing the service of American soldiers is an "admirable and unquestionably secular" objective.  *Van Orden* v. *Perry*, 545 U. S. 677, 715 (2005) (Stevens, J., dissenting).  But the Commission does not serve that objective by displaying a symbol that bears "a starkly sectarian message."  *Salazar* v. *Buono*, 559 U. S. 700, 736 (2010) (Stevens, J., dissenting).

## I

### A

The First Amendment commands that the government "shall make no law" either "respecting an establishment of religion" or "prohibiting the free exercise thereof."  See *Everson*, 330 U. S., at 15.  Adoption of these complementary provisions followed centuries of "turmoil, civil strife, and persecutio[n], generated in large part by established sects determined to maintain their absolute political and religious supremacy."  *Id*, at 8–9.  Mindful of that history, the fledgling Republic ratified the Establishment Clause, in the words of Thomas Jefferson, to "buil[d] a wall of separation between church and state."  Draft Reply to the Danbury Baptist Association, in 36 Papers of Thomas Jefferson 254, 255 (B. Oberg ed. 2009) (footnote omitted).

This barrier "protect[s] the integrity of individual conscience in religious matters."  *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844, 876 (2005).

It guards against the "anguish, hardship and bitter strife," *Engel* v. *Vitale*, 370 U. S. 421, 429 (1962), that can occur when "the government weighs in on one side of religious debate," *McCreary County*, 545 U. S., at 876. And while the "union of government and religion tends to destroy government and to degrade religion," separating the two preserves the legitimacy of each. *Engel*, 370 U. S., at 431.

The Establishment Clause essentially instructs: "[T]he government may not favor one religion over another, or religion over irreligion." *McCreary County*, 545 U. S., at 875. For, as James Madison observed, the government is not "a competent Judge of Religious Truth." Memorial and Remonstrance Against Religious Assessments, 8 Papers of James Madison 295, 301 (R. Rutland, W. Rachal, B. Ripel, & F. Teute eds. 1973) (Memorial and Remonstrance). When the government places its "power, prestige [or] financial support . . . behind a particular religious belief," *Engel*, 370 U. S., at 431, the government's imprimatur "mak[es] adherence to [that] religion relevant . . . to a person's standing in the political community," *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 594 (1989) (internal quotation marks omitted). Correspondingly, "the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Engel*, 370 U. S., at 431. And by demanding neutrality between religious faith and the absence thereof, the Establishment Clause shores up an individual's "right to select any religious faith or none at all." *Wallace* v. *Jaffree*, 472 U. S. 38, 53 (1985).

## B

In cases challenging the government's display of a religious symbol, the Court has tested fidelity to the principle of neutrality by asking whether the display has the "effect of 'endorsing' religion." *County of Allegheny*, 492 U. S., at

592. The display fails this requirement if it objectively "convey[s] a message that religion or a particular religious belief is favored or preferred." *Id.,* at 593 (internal quotation marks omitted; emphasis deleted).[3] To make that determination, a court must consider "the pertinent facts and circumstances surrounding the symbol and its placement." *Buono*, 559 U. S., at 721 (plurality opinion); *id.,* at 750–751 (Stevens, J., dissenting) (quoting plurality opinion).[4]

As I see it, when a cross is displayed on public property, the government may be presumed to endorse its religious content. The venue is surely associated with the State; the symbol and its meaning are just as surely associated exclusively with Christianity. "It certainly is not common for property owners to open up their property [to] monuments that convey a message with which they do not wish to be associated." *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 471 (2009). To non-Christians, nearly 30% of the population of the United States, Pew Research Center, America's Changing Religious Landscape 4 (2015), the

---

[3]JUSTICE GORSUCH's "no standing" opinion is startling in view of the many religious-display cases this Court has resolved on the merits. *E.g., McCreary County*, 545 U. S. 844; *Van Orden*, 545 U. S. 677; *Stone* v. *Graham*, 449 U. S. 39 (1980) (*per curiam*). And, if JUSTICE GORSUCH is right, three Members of the Court were out of line when they recognized that "[t]he [Establishment] Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall," *Buono*, 559 U. S., at 715 (opinion of Kennedy, J., joined by ROBERTS, C.J., and ALITO, J.) (quoting *County of Allegheny*, 492 U. S., at 661 (second alteration in original), for no one, according to JUSTICE GORSUCH, should be heard to complain about such a thing. But see Brief for Law Professors as *Amici Curiae* (explaining why offended observer standing is necessary and proper).

[4]This inquiry has been described by some Members of the Court as the "reasonable observer" standard. See, *e.g.*, *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 806 (1995) (Stevens, J., dissenting); *County of Allegheny*, 492 U. S., at 630–631 (O'Connor, J., concurring in part and concurring in judgment).

State's choice to display the cross on public buildings or spaces conveys a message of exclusion: It tells them they "are outsiders, not full members of the political community," *County of Allegheny*, 492 U. S., at 625 (O'Connor, J., concurring in part and concurring in judgment) (internal quotation marks omitted).  Cf. *Van Orden*, 545 U. S., at 708 (Stevens, J., dissenting) ("The adornment of our public spaces with displays of religious symbols" risks "'offend[ing] nonmembers of the faith being advertised as well as adherents who consider the particular advertisement disrespectful.'" (quoting *County of Allegheny*, 492 U. S., at 651 (Stevens, J., concurring in part and dissenting in part))).[5]

A presumption of endorsement, of course, may be overcome.  See *Buono*, 559 U. S., at 718 (plurality opinion) ("The goal of avoiding governmental endorsement does not require eradication of all religious symbols in the public realm.").  A display does not run afoul of the neutrality principle if its "setting . . . plausibly indicates" that the government has not sought "either to adopt [a] religious message or to urge its acceptance by others." *Van Orden*, 545 U. S., at 737 (Souter, J., dissenting).  The "typical museum setting," for example, "though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content." *Lynch* v. *Donnelly*, 465 U. S. 668, 692 (1984) (O'Connor, J., concurring). Similarly, when a public school history teacher discusses the Protestant Reformation, the setting makes clear that

_____

[5]See also Jews and Christians Discussion Group in the Central Committee of German Catholics, A Convent and Cross in Auschwitz, in The Continuing Agony: From the Carmelite Convent to the Crosses at Auschwitz 231–232 (A. Berger, H. Cargas, & S. Nowak eds. 2004) ("We Christians must appreciate [that] [t]hroughout history many non-Christians, especially Jews, have experienced the Cross as a symbol of persecution, through the Crusades, the Inquisition and the compulsory baptisms.").

the teacher's purpose is to educate, not to proselytize. The Peace Cross, however, is not of that genre.

## II
## A

"For nearly two millennia," the Latin cross has been the "defining symbol" of Christianity, R. Jensen, The Cross: History, Art, and Controversy ix (2017), evoking the foundational claims of that faith. Christianity teaches that Jesus Christ was "a divine Savior" who "illuminate[d] a path toward salvation and redemption." *Lynch*, 465 U. S., at 708 (Brennan, J., dissenting). Central to the religion are the beliefs that "the son of God," Jesus Christ, "died on the cross," that "he rose from the dead," and that "his death and resurrection offer the possibility of eternal life." Brief for *Amici* Christian and Jewish Organizations 7.[6] "From its earliest times," Christianity was known as "*religio crucis*—the religion of the cross." R. Viladesau, The Beauty of the Cross: The Passion of Christ in Theology and the Arts, From the Catacombs to the Eve of the Renaissance 7 (2006). Christians wear crosses, not as an ecumenical symbol, but to proclaim their adherence to Christianity.

An exclusively Christian symbol, the Latin cross is not emblematic of any other faith. *Buono*, 559 U. S., at 747 (Stevens, J., dissenting); Viladesau, *supra,* at 7 ("[T]he cross and its meaning . . . set Christianity apart from other world religions.").[7] The principal symbol of Christi-

―――――――

[6]Under "one widespread reading of Christian scriptures," non-Christians are barred from eternal life and, instead, are condemned to hell. Brief for *Amici* Christian and Jewish Organizations 2. On this reading, the Latin cross symbolizes both the promise of salvation and the threat of damnation by "divid[ing] the world between the saved and the damned." *Id.,* at 12.

[7]Christianity comprises numerous denominations. The term is here used to distinguish Christian sects from religions that do not embrace the defining tenets of Christianity.

anity around the world should not loom over public thoroughfares, suggesting official recognition of that religion's paramountcy.

### B

The Commission urges in defense of its monument that the Latin cross "is not merely a reaffirmation of Christian beliefs"; rather, "when used in the context of a war memorial," the cross becomes "a universal symbol of the sacrifices of those who fought and died." Brief for Petitioner Maryland-National Capital Park and Planning Commission 34–35 (Brief for Planning Commission) (internal quotation marks omitted). See also Brief for United States as *Amicus Curiae* 25 (The Latin cross is "a Christian symbol . . . [b]ut it is also 'a symbol often used to honor and respect [soldiers'] heroic acts.'" (quoting *Buono*, 559 U. S., at 721 (plurality opinion); some internal quotation marks omitted)).

The Commission's "[a]ttempts to secularize what is unquestionably a sacred [symbol] defy credibility and disserve people of faith." *Van Orden*, 545 U. S., at 717 (Stevens, J., dissenting). See, *e.g.,* Brief for *Amici* Christian and Jewish Organizations 7 ("For Christians who think seriously about the events and message that the cross represents, [the Commission's] claims are deeply offensive."). The asserted commemorative meaning of the cross rests on—and is inseparable from—its Christian meaning: "the crucifixion of Jesus Christ and the redeeming benefits of his passion and death," specifically, "the salvation of man." *American Civil Liberties Union of Illinois* v. *St. Charles*, 794 F. 2d 265, 273 (CA7 1986) (internal quotation marks omitted).

Because of its sacred meaning, the Latin cross has been used to mark Christian deaths since at least the fourth century. See Jensen, *supra,* at 68–69. The cross on a grave "says that a Christian is buried here," Brief for

*Amici* Christian and Jewish Organizations 8, and "com-memorates [that person's death] by evoking a conception of salvation and eternal life reserved for Christians," Brief for *Amicus* Jewish War Veterans 7. As a commemorative symbol, the Latin cross simply "makes no sense apart from the crucifixion, the resurrection, and Christianity's prom-ise of eternal life." Brief for *Amici* Christian and Jewish Organizations 8.[8]

The cross affirms that, thanks to the soldier's embrace of Christianity, he will be rewarded with eternal life. *Id.,* at 8–9. "To say that the cross honors the Christian war dead does not identify a secular meaning of the cross; it merely identifies a common application of the religious meaning." *Id.,* at 8. Scarcely "a universal symbol of sacri-fice," the cross is "the symbol of one particular sacrifice." *Buono*, 559 U. S., at 748, n. 8 (Stevens, J., dissenting).[9]

———————

[8]The Court sets out familiar uses of the Greek cross, including the Red Cross and the Navy Cross, *ante,* at 3, 22, and maintains that, today, they carry no religious message. But because the Latin cross has never shed its Christian character, its commemorative meaning is exclusive to Christians. The Court recognizes as much in suggesting that the Peace Cross features the Latin cross for the same reason "why Holocaust memorials invariably include Stars of David": those sectarian "symbols . . . signify what death meant for those who are memorial-ized." *Ante*, at 30.

[9]Christian soldiers have drawn parallels between their experiences in war and Jesus's suffering and sacrifice. See, *e.g.*, C. Dawson, Living Bayonets: A Record of the Last Push 19–20 (1919) (upon finding a crucifix strewn among rubble, a soldier serving in World War I wrote home that Jesus Christ "seem[ed] so like ourselves in His lonely and unhallowed suffering"). This comparison has been portrayed by artists, see, *e.g.*, 7 Encyclopedia of Religion 4348 (2d ed. 2005) (painter George Rouault's 1926 *Miserere* series "compares Christ's suffering with twentieth-century experiences of human sufferings in war"), and documented by historians, see, *e.g.*, R. Schweitzer, The Cross and the Trenches: Religious Faith and Doubt Among British and American Great War Soldiers 28–29 (2003) (given the horrors of trench warfare, "[t]he parallels that soldiers saw between their suffering and Christ's make their identification with Jesus both understandable and reveal-

GINSBURG, J., dissenting

Every Court of Appeals to confront the question has held that "[m]aking a . . . Latin cross a war memorial does not make the cross secular," it "makes the war memorial sectarian." *Id.*, at 747.[10]  See also *Separation of Church*

_____

ing"); Lemay, Politics in the Art of War: The American War Cemeteries, 38 Int'l J. Mil. History & Historiography 223, 225 (2018) ("[T]he [cross] grave markers assert the absolute valour and Christ-like heroism of the American dead . . . .").

[10]See 874 F. 3d 195, 207 (CA4 2017) (case below) ("Even in the memorial context, a Latin cross serves not . . . as a generic symbol of death, but rather a Christian symbol of the death of Jesus Christ."); *American Atheists, Inc.* v. *Davenport*, 637 F. 3d 1095, 1122 (CA10 2010) ("[A] memorial cross is not a *generic* symbol of death; it is a *Christian* symbol of death that signifies or memorializes the death of a *Christian*."); *Trunk* v. *San Diego*, 629 F. 3d 1099, 1102 (CA9 2011) ("Resurrection of this Cross as a war memorial does not transform it into a secular monument."); *Separation of Church and State Comm.* v. *Eugene*, 93 F. 3d 617, 619 (CA9 1996) (*per curiam*) ("[T]he City urges that the cross is no longer a religious symbol but a war memorial.  This argument . . . fails to withstand Establishment Clause analysis."); *Gonzales* v. *North Twp. of Lake Cty.*, 4 F. 3d 1412, 1418 (CA7 1993) ("[W]e are masters of the obvious, and we know that . . . the Latin cross . . . is '[the] unmistakable symbol of Christianity as practiced in this country today.'" (quoting *Harris* v. *Zion*, 927 F. 2d 1401, 1403 (CA7 1991)).  See also *Jewish War Veterans of the United States* v. *United States*, 695 F. Supp. 3, 11 (DC 1988) ("[D]efendants are unable to cite a single federal case where a cross such as the one at issue here has survived Establishment Clause scrutiny.").

The Courts of Appeals have similarly concluded that the Latin cross remains a Christian symbol when used for other purposes.  See, *e.g.*, *Robinson* v. *Edmond*, 68 F. 3d 1226, 1232 (CA10 1995) (city seal depicting the cross) ("The religious significance and meaning of the Latin or Christian cross are unmistakable."); *Carpenter* v. *City and County of San Francisco*, 93 F. 3d 627, 630 (CA9 1996) (103-foot cross in public park) ("The Latin cross . . . [']represents with relative clarity and simplicity the Christian message of the crucifixion and resurrection of Jesus Christ, a doctrine at the heart of Christianity.'"); *American Civil Liberties Union of Ill.* v. *St. Charles*, 794 F. 2d 265, 272–273 (CA7 1986) (35-foot cross displayed atop a fire house during the Christmas season) ("The cross . . . is 'the principal symbol of the Christian religion, recalling the crucifixion of Jesus Christ and the redeeming benefits of his passion and death.'"); *Friedman* v. *Board of Cty. Comm'rs of Bernalillo*

*and State Comm.* v. *Eugene*, 93 F. 3d 617, 626 (CA9 1996)
(O'Scannlain, J., concurring in result) ("[T]he City's use of
a cross to memorialize the war dead may lead observers to
believe that the City has chosen to honor only Christian
veterans.").

The Peace Cross is no exception. That was evident from
the start. At the dedication ceremony, the keynote speaker
analogized the sacrifice of the honored soldiers to that
of Jesus Christ, calling the Peace Cross "symbolic of Cal-
vary," App. 449, where Jesus was crucified. Local report-
ers variously described the monument as "[a] mammoth
cross, a likeness of the Cross of Calvary, as described in
the Bible," *id.,* at 428; "a monster [C]alvary cross," *id.,* at
431; and "a huge sacrifice cross," *id.,* at 439. The charac-
ter of the monument has not changed with the passage of
time.

C

The Commission nonetheless urges that the Latin cross
is a "well-established" secular symbol commemorating, in
particular, "military valor and sacrifice [in] World War I."
Brief for Planning Commission 21. Calling up images of
United States cemeteries overseas showing row upon row
of cross-shaped gravemarkers, *id.,* at 4–8; see *ante*, at 4–5,
21–22; Brief for United States as *Amicus Curiae* 26, the
Commission overlooks this reality: The cross was never
perceived as an appropriate headstone or memorial
for Jewish soldiers and others who did not adhere to
Christianity.

1

A page of history is worth retelling. On November 11,
1918, the Great War ended. Bereaved families of Ameri-

---

*Cty.,* 781 F. 2d 777, 782 (CA10 1985) (county seal depicting Latin cross)
("[T]he seal ... conveys a strong impression to the average observer
that Christianity is being endorsed.").

can soldiers killed in the war sought to locate the bodies of their loved ones, and then to decide what to do with their remains. Once a soldier's body was identified, families could choose to have the remains repatriated to the United States or buried overseas in one of several American military cemeteries, yet to be established. Eventually, the remains of 46,000 soldiers were repatriated, and those of 30,000 soldiers were laid to rest in Europe. American Battle Monuments Commission, Annual Report to the President of the United States Fiscal Year 1925, p. 5 (1926) (ABMC Report).

While overseas cemeteries were under development, the graves of American soldiers in Europe were identified by one of two temporary wooden markers painted white. Christian soldiers were buried beneath the cross; the graves of Jewish soldiers were marked by the Star of David. See L. Budreau, Bodies of War: World War I and the Politics of Commemoration in America, 1919–1933, p. 120 (2010). The remains of soldiers who were neither Christian nor Jewish could be repatriated to the United States for burial under an appropriate headstone.[11]

When the War Department began preparing designs for permanent headstones in 1919, "no topic managed to stir more controversy than the use of religious symbolism." *Id.,* at 121–122. Everyone involved in the dispute, however, saw the Latin cross as a Christian symbol, not as a universal or secular one. To achieve uniformity, the War Department initially recommended replacing the tempo-

———————

[11]For unidentified soldiers buried overseas, the American Battle Monuments Commission (ABMC) used the cross and the Star of David markers "in 'proportion of known Jewish dead to know[n] Christians.'" App. 164. The ABMC later decided that "all unidentified graves would be marked with a [c]ross." *Id.,* at 164, n. 21. This change was prompted by "fear [that] a Star of David would be placed over an [u]nknown Christian," not by the belief that the cross had become a universal symbol. *Ibid.*

rary sectarian markers with plain marble slabs resembling "those designed for the national cemeteries in the United States."   Van Duyne, Erection of Permanent Headstones in the American Military Cemeteries in Europe, The Quartermaster Review (1930) (Quartermaster Report).

The War Department's recommendation angered prominent civil organizations, including the American Legion and the Gold Star associations: the United States, they urged, ought to retain both the cross and Star of David. See *ibid.*; Budreau, *supra*, at 123.  In supporting sectarian markers, these groups were joined by the American Battle Monuments Commission (ABMC), a newly created independent agency charged with supervising the establishment of overseas cemeteries.  ABMC Report 57.  Congress weighed in by directing the War Department to erect headstones "of such design and material as may be agreed upon by the Secretary of War and the American Battle Monuments Commission." *Ibid.* (internal quotation marks omitted).  In 1924, the War Department approved the ABMC's "designs for a Cross and Star of David."  Quartermaster Report; ABMC Report 57.[12]

Throughout the headstone debate, no one doubted that the Latin cross and the Star of David were sectarian gravemarkers, and therefore appropriate only for soldiers who adhered to those faiths.  A committee convened by the War Department composed of representatives from "seven prominent war-time organizations" as well as "religious bodies, Protestant, Jewish, [and] Catholic" agreed "unanimous[ly] . . . that marble crosses be placed on the graves of all *Christian* American dead buried abroad, and that the graves of the Jewish American dead be marked by the six-pointed star."  Durable Markers in the Form of Crosses

—————

[12]A photograph depicting the two headstones is reproduced in the Appendix, *infra*, at 21.

for Graves of American Soldiers in Europe, Hearings before the Committee on Military Affairs of the House of Representatives, 68th Cong., 1st Sess., 24 (1924) (emphasis added).  The Executive Director of the Jewish Welfare Board stated that "if any religious symbol is erected over the graves, then Judaism should have its symbol over the graves of its dead." *Id.,* at 19.  Others expressing views described the Latin cross as the appropriate symbol to "mar[k] the graves of the *Christian* heroes of the American forces." *Id.,* at 24 (emphasis added).  As stated by the National Catholic War Council, "the sentiment and desires of all Americans, Christians and Jews alike, are one": "They who served us in life should be honored, as they would have wished, in death." *Ibid.*[13]

Far more crosses than Stars of David, as one would expect, line the grounds of American cemeteries overseas, for Jews composed only 3% of the United States population in 1917.  J. Fredman & L. Falk, Jews in American Wars 100 (5th ed. 1954).  Jews accounted for nearly 6% of U. S. forces in World War I (in numbers, 250,000), and 3,500 Jewish soldiers died in that war. *Ibid.*  Even in Flanders Field, with its "'crosses, row on row,'" *ante,* at 5 (quoting J. McCrae, In Flanders Fields, In Flanders Fields and Other Poems 3 (G. P. Putnam's Sons ed. 1919)), "Stars of David mark the graves of [eight American soldiers] of Jewish faith," American Battle Monuments Commission, Flanders Field American Cemetery and Memorial Visitor Booklet 11.[14]

———————

[13]As noted, *supra,* at 12, the bodies of soldiers who were neither Christian nor Jewish could be repatriated to the United States and buried in a national cemetery (with a slab headstone), Quartermaster Report, or in a private cemetery (with a headstone of the family's choosing).

[14]Available at https://www.abmc.gov/sites/default/files/publications/ FlandersField_Booklet.pdf (all Internet materials as last visited June 18, 2019).  For the respective numbers of cross and Star of David

2

Reiterating its argument that the Latin cross is a "universal symbol" of World War I sacrifice, the Commission states that "40 World War I monuments . . . built in the United States . . . bear the shape of a cross." Brief for Planning Commission 8 (citing App. 1130). This figure includes memorials that merely "incorporat[e]" a cross. App. 1130.[15] Moreover, the 40 monuments compose only 4% of the "948 outdoor sculptures commemorating the First World War." *Ibid.* The Court lists just seven freestanding cross memorials, *ante,* at 6, n. 10, less than 1% of the total number of monuments to World War I in the United States, see App. 1130. Cross memorials, in short, are outliers. The overwhelming majority of World War I memorials contain no Latin cross.

In fact, the "most popular and enduring memorial of the [post-World War I] decade" was "[t]he mass-produced *Spirit of the American Doughboy* statue." Budreau, Bodies of War, at 139. That statue, depicting a U. S. infantryman, "met with widespread approval throughout American communities." *Ibid.* Indeed, the first memorial to World War I erected in Prince George's County "depict[s] a doughboy." App. 110–111. The Peace Cross, as Plaintiffs' expert historian observed, was an "aberration . . . even in the era [in which] it was built and dedicated." *Id.,* at 123.

Like cities and towns across the country, the United States military comprehended the importance of "pay[ing] equal respect to all members of the Armed Forces who perished in the service of our country," *Buono,* 559 U. S., at 759 (Stevens, J., dissenting), and therefore avoided

———————

headstones, see ABMC, Flanders Field American Cemetery and Memorial Brochure 2, available at https://www.abmc.gov/sites/default/files/publications/Flanders%20Field_Brochure_Mar2018.pdf.

[15]No other monument in Bladensburg's Veterans Memorial Park displays the Latin cross. For examples of monuments in the Park, see the Appendix, *infra*, at 20–21.

incorporating the Latin cross into memorials. The construction of the Tomb of the Unknown Soldier is illustrative. When a proposal to place a cross on the Tomb was advanced, the Jewish Welfare Board objected; no cross appears on the Tomb. See App. 167. In sum, "[t]here is simply 'no evidence . . . that the cross has been widely embraced by'—or even applied to—'non-Christians as a secular symbol of death' or of sacrifice in military service" in World War I or otherwise. *Trunk* v. *San Diego*, 629 F. 3d 1099, 1116 (CA9 2011).

## D

Holding the Commission's display of the Peace Cross unconstitutional would not, as the Commission fears, "inevitably require the destruction of other cross-shaped memorials throughout the country." Brief for Planning Commission 52. When a religious symbol appears in a public cemetery—on a headstone, or as the headstone itself, or perhaps integrated into a larger memorial—the setting counters the inference that the government seeks "either to adopt the religious message or to urge its acceptance by others." *Van Orden*, 545 U. S., at 737 (Souter, J., dissenting). In a cemetery, the "privately selected religious symbols on individual graves are best understood as the private speech of each veteran." Laycock, Government-Sponsored Religious Displays: Transparent Rationalizations and Expedient Post-Modernism, 61 Case W. Res. L. Rev. 1211, 1242 (2011). See also *Summum*, 555 U. S., at 487 (Souter, J., concurring in judgment) ("[T]here are circumstances in which government maintenance of monuments does not look like government speech at all. Sectarian identifications on markers in Arlington Cemetery come to mind."). Such displays are "linked to, and sho[w] respect for, the individual honoree's faith and beliefs." *Buono*, 559 U. S., at 749, n. 8 (Stevens, J., dissenting). They do not suggest governmental endorsement

of those faith and beliefs.[16]

Recognizing that a Latin cross does not belong on a public highway or building does not mean the monument must be "torn down." *Ante,* at 2 (BREYER, J., concurring); *ante,* at 1 (GORSUCH, J., concurring in judgment).[17] "[L]ike the determination of the violation itself," the "proper remedy . . . is necessarily context specific." *Buono,* 559 U. S., at 755, n. 11 (Stevens, J., dissenting). In some instances, the violation may be cured by relocating the monument to private land or by transferring ownership of the land and monument to a private party.

\*     \*     \*

In 1790, President Washington visited Newport, Rhode Island, "a longtime bastion of religious liberty and the home of one of the first communities of American Jews." *Town of Greece* v. *Galloway,* 572 U. S. 565, 636 (2014) (KAGAN, J., dissenting). In a letter thanking the congregation for its warm welcome, Washington praised "[t]he citizens of the United States of America" for "giv[ing] to mankind . . . a policy worthy of imitation": "All possess alike liberty of conscience and immunities of citizenship." Letter to Newport Hebrew Congregation (Aug. 18, 1790), in 6 Papers of George Washington 284, 285 (D. Twohig ed. 1996). As Washington and his contemporaries were

————————

[16]As to the Argonne Cross Memorial and the Canadian Cross of Sacrifice in Arlington National Cemetery, visitors to the cemetery "expec[t] to view religious symbols, whether on individual headstones or as standalone monuments." Brief for *Amicus* Jewish War Veterans 17.

[17]The Court asserts that the Court of Appeals "entertained" the possibility of "amputating the arms of the cross." *Ante,* at 24. The appeals court, however, merely reported Plaintiffs' "desired injunctive relief," namely, "removal or demolition of the Cross, or removal of the arms from the Cross 'to form a non-religious slab or obelisk.'" 874 F. 3d, at 202, n. 7. See also *id.,* at 212, n. 19 (noting that the parties remained "free to explore alternative arrangements that would not offend the Constitution").

aware, "some of them from bitter personal experience," *Engel*, 370 U. S., at 429, religion is "too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate," *id.,* at 432 (quoting Memorial and Remonstrance). The Establishment Clause, which preserves the integrity of both church and state, guarantees that "however . . . individuals worship, they will count as full and equal American citizens." *Town of Greece*, 572 U. S., at 615 (KAGAN, J., dissenting). "If the aim of the Establishment Clause is genuinely to uncouple government from church," the Clause does "not permit . . . a display of th[e] character" of Bladensburg's Peace Cross. *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 817 (1995) (GINSBURG, J., dissenting).

Appendix to opinion of GINSBURG, J.

## APPENDIX



The Bladensburg Peace Cross.  App. 887.



Map showing the location of the Peace Cross.  App. 1533.



The World War II Memorial in
Veterans Memorial Park.  App. 891.



Plaque of the World War II Memorial.  App. 891.



The Korea-Vietnam Veterans Memorial in
Veterans Memorial Park.  App. 894.



Headstones in the Henri-Chappelle American
Cemetery and Memorial in Belgium.  American
Battle Monuments Commission, Henri-Chappelle
American Cemetery and Memorial 16 (1986).